[638 NYS2d 500]

WALTER W. BOLAND, Individually and as Administrator of the Estate of AARON BOLAND, Deceased, and as Parent and Natural Guardian of JENNIFER BOLAND, an Infant, Respondent-Appellant, v STATE OF NEW YORK, Appellant-Respondent. (Claim No. 79406.)

Third Department, February 29, 1996

### APPEARANCES OF COUNSEL

*Dennis C. Vacco, Attorney-General,* Albany *(Frank K. Walsh* and *Peter G. Crary* of counsel), for appellant-respondent.

*Robert E. Lahm,* Syracuse *(Matthew E. Whritenour* of counsel), for respondent-appellant.

### OPINION OF THE COURT

CREW III, J.

Claimant is the father of two children, Jennifer (born in 1982) and Aaron (born in 1985). Following his divorce from the children's mother, claimant married Penny Boland (hereinafter Boland) in April 1988. Later that year claimant, a soldier

in the United States Army, received orders transferring him to Germany. As housing for Boland and the children was not immediately available in Germany, arrangements were made for them to stay with Boland's father, who resided in a mobile home located in a trailer park in the City of Canandaigua, Ontario County.

Following claimant's departure for Germany in September 1988, Boland apparently began physically abusing the children. Two neighbors in the trailer park, Linda Siesto and Tara Reeve, regularly noticed scrapes and bruises on the children and observed that after claimant left the country, the children became quite thin. On January 23, 1989, while Siesto and Reeve were standing at the bus stop waiting for their children, Aaron approached Reeve, removed his hat and said, "look at my boo-boos". Siesto and Reeve observed a large bruise on Aaron's forehead and smaller bruises on his face and chin, the latter of which appeared to resemble fingerprints. When questioned, Boland apparently stated that Aaron had choked on food and fallen out of his highchair—an explanation that Boland had given for similar bruises in the past.

Unpersuaded by Boland's explanation, Siesto and Reeve returned to Reeve's residence and Siesto called the Ontario County Child Protective Unit (hereinafter CPU), which directed her to contact the hotline number maintained by the State-wide Central Register of Child Abuse and Maltreatment (hereinafter SCR; see, Social Services Law § 422).[1] Apparently, no SCR workers were available to take the report, so Siesto left her first name and Reeve's first name and number. A few hours later Kim Mariotti, a child protective specialist employed by the SCR, contacted Reeve. Although Reeve apparently did not give her full name, the report completed by Mariotti indicates that Reeve did, among other things, provide Boland and the children's first names, ages and complete address, describe the type and frequency of Aaron's injuries and indicate that Aaron's injuries were inconsistent with the explanations provided by Boland. Although Reeve was unsure whether she indicated to Mariotti that she considered this matter to be an emergency, she testified at her examination before trial that she stressed that this was not the first time she had observed bruises on Aaron and that she attempted to convey the urgency

---

1. Both Reeve and Siesto were aware that the State maintained a hotline number for this purpose, but they elected to contact the Ontario County CPU because they thought that the local office would be able to respond more quickly.

of the situation to Mariotti. Reeve further testified that although Mariotti did not inform her that the matter would be investigated within 24 hours, she knew that such a requirement existed and was assured that the matter "would be looked into".

After speaking with Reeve, Mariotti deemed the information provided to be "a report of child abuse or maltreatment" (Social Services Law § 422 [2] [a]) and prepared a DSS-2221 form detailing the suspected abuse. Mariotti, however, then erroneously reported the matter to the Oneida County CPU, rather than the Ontario County CPU, and it was not until approximately 10:00 A.M. on January 25, 1989—almost two days after the initial report had been made—that the Ontario County CPU was notified and responded to the Boland residence.[2] Tragically, earlier that day, Aaron had been severely beaten by Boland and hospitalized, where he died two days later from his injuries. Jennifer was removed from the home and placed in protective custody and now resides with claimant. Boland subsequently was convicted of manslaughter in the second degree in connection with Aaron's death (see, People v Boland, 187 AD2d 1014).

In April 1990, claimant filed an amended claim in this action alleging negligence and gross negligence against the State with respect to, *inter alia*, the operation of the SCR hotline. Following joinder of issue and discovery, the State moved for

---

2. The series of events leading to this lamentable delay are as follows. Shortly after 5:00 P.M. on January 23, 1989, Oneida County CPU worker Joseph Cantarano spoke with Mariotti regarding the report of suspected abuse. Apparently neither Mariotti nor Cantarano realized that the City of Canandaigua was located in Ontario County. (In this regard, both Mariotti and her supervisor testified at their respective examinations before trial that there were numerous sources, readily available, that would have enabled Mariotti to correctly determine the appropriate county designation.) Cantarano's supervisor discovered the error the following morning and directed Cantarano to immediately contact the SCR and report that the case had been incorrectly assigned to Oneida County. Cantarano apparently had trouble reaching the SCR, so when he received a call from a SCR worker on an unrelated matter, he informed her that he wished to transfer a case. The SCR worker apparently believed that the matter involved a routine transfer and, after checking with her supervisor, told Cantarano to call the "county line". The record indicates that routine transfers, which occur when a family receiving services moves from one county to another, are dealt with in the normal course of business, whereas incorrectly assigned cases, such as the matter at issue here, receive priority. In any event, Cantarano called the county line and left a message, the substance of which he was unable to recall. Due to either a transcription error or Cantarano's failure to indicate that the matter was an emergency, the message was not prioritized, and Cantarano was not contacted until the following morning, January 25, 1989.

summary judgment contending, *inter alia*, that the State was entitled to immunity because claimant had not demonstrated that a special relationship existed between the State and his children. The Court of Claims denied the motion (161 Misc 2d 1019), finding that liability could be premised upon Mariotti's alleged negligence in performing a ministerial act, i.e., directing the report of abuse to the proper county CPU, and the State appeals from this portion of the order. Additionally, the Court of Claims concluded that claimant failed to establish that a special relationship existed between the State and the children, and claimant cross-appeals from that portion of the. order.

In enacting the child protective services provisions of the Social Services Law (*see*, Social Services Law, art 6, tit 6), the Legislature found that "[a]bused and maltreated children in this state [were] in *urgent* need of an effective child protective service to prevent them from suffering further injury and impairment" (Social Services Law § 411 [emphasis supplied]) and, to that end, created a statutory scheme designed to "encourage more complete reporting" of suspected abuse and maltreatment and to establish, at the county level, a child protective service capable of swiftly and competently investigating such reports (*ibid.*). As part of this extensive effort, the SCR was created to receive reports of suspected abuse and maltreatment via a State-wide hotline number and, insofar as is relevant to this appeal, the statute provides that "[w]hen any allegations contained in such telephone calls could reasonably constitute a report of child abuse or maltreatment, such allegations shall be immediately transmitted orally or electronically by the department *to the appropriate local child protective service for investigation*" (Social Services Law § 422 [2] [a] [emphasis supplied]).[3]

■ As a starting point, we note that regardless of whether Mariotti's failure to transmit Reeve's report of abuse to the ap-

---

3. Social Services Law, article 6, title 6 establishes a mandatory reporting system for suspected child abuse and maltreatment and, in addition to operating the SCR (*see*, Social Services Law § 422), the State, through its Department of Social Services, is required to, *inter alia*, conduct a continuing education program for local CPU staff and mandated reporters of abuse and maltreatment (*see*, Social Services Law § 421 [1]), issue guidelines to assist local CPUs in the interpretation and assessment of reports made to the SCR (*see*, Social Services Law § 421 [2] [c]) and promulgate rules and regulations establishing uniform requirements for the investigation of such reports (*see*, Social Services Law § 421 [3]), establish training requirements for CPU staff (*see*, Social Services Law § 421 [5] [b]), and monitor and supervise the performance of the local agencies (*see*, Social Services Law § 421 [8]).

propriate local CPU ultimately forms a basis for imposing liability upon the State, one thing is clear—the State's initial assertion that it neither owed nor assumed *any* duty to Aaron and Jennifer is meritless. The statutory scheme reveals that the State voluntarily assumed responsibility for administering the SCR and monitoring the provision of the child protective services provided by the local agencies (indeed the State concedes as much) and, having done so, the State was, in our view, required to carry out its statutory obligations with due regard for the very children the statute was designed to protect (*cf., Prasad v County of Orange*, 159 Misc 2d 330, 332-333).[4] Moreover, even assuming that no specific duty attached with respect to Aaron and Jennifer prior to the point in time that Mariotti determined that Reeve's allegations constituted a report, the statute makes it abundantly clear that once that determination was made, the State was obligated to report the matter to the appropriate local agency. Thus, it is readily apparent that, at the very least, the State voluntarily assumed a duty with respect to claimant's children at that point in time (*cf., Florence v Goldberg*, 44 NY2d 189, 196; *Bartels v County of Westchester*, 76 AD2d 517, 522), and any assertion to the contrary is belied by the very explicit terms of the statute.

Beginning with claimant's cross appeal, we must consider whether claimant has established the existence of a special relationship between the State and his children. As a general rule, a governmental entity may not be held liable for injuries resulting from its failure to provide police and fire protection to a particular individual (*see, Kircher v City of Jamestown*, 74 NY2d 251, 255-256; *Cuffy v City of New York*, 69 NY2d 255, 260; *Pike v State of New York*, 214 AD2d 934, 935, *lv dismissed and denied* 86 NY2d 811). This proposition is founded upon the quite reasonable rationale that the duty to provide police and fire protection is owed to the public at large and not to any particular individual or group and, further, that the decision as to how to best allocate those resources is properly left to the discretion of policy makers (*see, Kircher v City of Jamestown, supra*, at 256; *Cuffy v City of New York, supra*, at 260). An exception to this rule exists, however, where a special relationship has been established between the injured party and the governmental entity (*see, Pike v State of New York, supra*, at

---

4. To quote Chief Judge Cardozo, "[t]he hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all" (*Moch Co. v Rensselaer Water Co.*, 247 NY 160, 167).

935). The elements of such a relationship are "(1) the assumption by the governmental entity, via promises or actions, of an affirmative duty to act on behalf of the one injured, (2) knowledge on the part of the entity that inaction could lead to harm, (3) direct contact of some form between the entity's agents and the injured party, and (4) the injured party's justifiable reliance [up]on the entity's affirmative undertaking" (*supra,* at 935; *see, Cuffy v City of New York, supra,* at 260).

■ Based upon our review of the record and the relevant statutory scheme, we are persuaded that claimant has, as a matter of law, established the existence of a special relationship between the State and his children. With respect to the first element, as should be evident from our foregoing discussion, the State plainly, affirmatively and voluntarily assumed a duty to act on behalf of claimant's children. Additionally, even a cursory review of Social Services Law §§ 411 and 422 reveals a legislative acknowledgement that inaction on the part of the State or its agents with regard to the investigation of suspected abuse or maltreatment could lead to harm, thereby satisfying the second prong of the special relationship test. Thus, our inquiry turns to whether claimant has established contact and reliance.

In addressing this issue, the State contends that inasmuch as there concededly was no direct contact between claimant's children, or any other member of Boland's household, and the State (*compare, Cuffy v City of New York, supra,* at 262-263, [contact between head of household and law enforcement officials ran to other members of household residing there]; *Sorichetti v City of New York,* 65 NY2d 461 [contact between injured infant's mother and law enforcement officials deemed sufficient to satisfy this requirement]), neither the contact nor reliance elements may be said to be satisfied. We cannot agree. In our view, the extensive and detailed statutory scheme at issue, which has as its avowed purpose the protection of a discrete class of individuals, i.e., abused and maltreated children (*see,* Social Services Law § 411), obviates the need for claimant to independently establish the requisite contact and reliance. In short, we believe the statute itself sufficiently addresses the policy considerations underlying the contact and reliance elements and, as such, claimant's compliance with those provisions is entirely unnecessary.

The special duty rule is based, in large measure, upon policy considerations, and the contact and reliance elements are at the heart of those considerations (*see, Kircher v City of*

*Jamestown*, 74 NY2d 251, 257, *supra*; *Cuffy v City of New York*, *supra*, at 261). Specifically, the direct contact element serves to rationally limit the class of persons to whom the governmental entity's duty of protection runs and "is necessary to establish a special relationship beyond that which all citizens share with government" (*Bogart v Town of New Paltz*, 145 AD2d 110, 113, *lv denied* 74 NY2d 608; *see, Kircher v City of Jamestown, supra*, at 257). Accordingly, proper application of this requirement depends upon the particular facts of a given case, with due consideration being given to the policy considerations underlying the rule in the first instance.

Contrary to the State's assertion, Social Services Law, article 6, title 6 clearly is not designed to benefit the public at large. Indeed, the statute is limited to providing assistance and preventing further harm and injury to a discrete, discernible and protected class of individuals, i.e., abused and maltreated children.[5] Accordingly, the statute on its face satisfies and is entirely consistent with the primary objective of the direct contact element—namely, to rationally limit the class of individuals to whom the State's duty of protection extends. Additionally, the statute represents a specific legislative determination to devote resources to the care and protection of abused and maltreated children and, as such, obviates the concern of leaving resource allocation to the discretion of policy makers.

Similar reasoning leads us to conclude that the statute itself satisfies the justifiable reliance element of the special relationship test. As the Court of Appeals noted in *Kircher v City of Jamestown* (74 NY2d 251, 259, *supra*), "[r]equiring that there be such reliance is consistent with the purpose of the special duty rule to place controllable limits on the scope of the municipality's duty of protection and to prevent the exception from swallowing the general rule of governmental immunity". In this regard, the Court in *Kircher* went on to observe that before tort liability should be imposed for a municipality's failure to take appropriate action each and every time one of its citizens became a victim of a crime, there should be a legislative determination that the municipality indeed obligated itself to provide that degree of protection (*see, supra*). Here, in enact-

---

5. On this basis alone, the cases relied upon by the State for the proposition that no special duty may be said to exist here (*see, e.g., Kircher v City of Jamestown*, 74 NY2d 251, *supra*; *Cuffy v City of New York*, 69 NY2d 255, *supra*; *Bogart v Town of New Paltz*, 145 AD2d 110, *supra*) are distinguishable in that each of the cited cases concern police or fire protection and, as such, deal with a municipality's duty to the public at large.

ing Social Services Law, article 6, title 6, the Legislature has made just such a determination and has clearly delineated the State's responsibilities with respect to the care and protection of abused children. Simply stated, we believe that by enacting Social Services Law, article 6, title 6, the State voluntarily assumed a duty to protect claimant's children, and those similarly situated, and that its conduct in this regard has progressed to the point where the State's failure to provide the promised protection would result not " 'merely in withholding a benefit, but positively or actively in working an injury' " (*De Long v County of Erie*, 60 NY2d 296, 305, quoting *Moch Co. v Rensselaer Water Co.*, 247 NY 160, 167, *supra*; *see*, *Kircher v City of Jamestown*, *supra*, at 256).[6]

■ Turning to the State's appeal, the State contends that the Court of Claims erred in finding that, even in the absence of a special relationship, claimant could maintain his claim against the State based upon Mariotti's negligent performance of a ministerial act. In this regard, there can be no serious dispute that the act from which the State's negligence is alleged to flow is ministerial in nature (*see generally*, *Mon v City of New York*, 78 NY2d 309, 313; *Tango v Tulevech*, 61 NY2d 34, 40). Once Mariotti determined that Reeve's allegations constituted a report, there was no further opportunity for her to exercise any "reasoned judgment" (*Tango v Tulevech*, *supra*, at 41; *see*, *Glowinski v Braun*, 105 AD2d 1153); indeed, all that remained for Mariotti to do was to transmit the report to the appropriate county CPU in accordance with the plain wording of Social Services Law § 422 (2) (a) (*see*, *Ford Motor Credit Co. v State of New York*, 133 AD2d 980, 982). This Mariotti concededly failed to do, despite having resources available that would have permitted her to conclusively determine that the City of Canandaigua was in fact located in Ontario County.

As a majority of this Court has found that claimant established both the existence of a special relationship between the State and his children and that the State's alleged negligence flowed from the negligent performance of a ministerial act, the precise question posed by the State on its appeal—namely, whether liability can be imposed upon the State based solely upon Mariotti's negligent performance of a ministerial act, would not need to be addressed were it not for the positions

---

6. In light of this conclusion, we need not address claimant's alternative argument—namely, that Reeve was acting on behalf of Aaron and Jennifer and, as such, her direct contact with Mariotti satisfied the contact and reliance elements of the special relationship test.

taken by two of our colleagues. In this regard, although Justice White concludes that claimant has failed to demonstrate the existence of a special relationship, he agrees with the position taken by the Court of Claims that liability may be imposed upon the State based solely upon Mariotti's negligent performance of a ministerial act. Justice Mercure, on the other hand, although agreeing that a special relationship exists between the State and claimant's children, is of the view that claimant may maintain his claim against the State only because he has established both that a special relationship exists and that the State's alleged negligence stems from its negligent performance of a ministerial act. Given these divergent views, we must now address the substance of the State's appeal.

As a starting point, the State's argument in this regard is not only premised upon a proposition already rejected by this Court—namely, that absent a special relationship, the State simply owed no duty to claimant's children in the first instance—but once again blurs the distinction to be drawn between the existence of a duty and the imposition of liability. As we observed at the outset, not only does the underlying statutory scheme impose a duty upon the State to protect claimant's children, but the State voluntarily assumed such a duty when it concluded that Reeve's allegations constituted a report of abuse. Thus, although a special relationship clearly could not be found absent a duty, the converse simply is not true.

Nor, with all due respect, are we able to accept Justice Mercure's argument on this point. Plainly, if an injured party is attempting to challenge an act or conduct that is purely discretionary in nature, i.e., one involving a quasi-judicial determination, the State is simply immune from liability and no consideration need be given to whether a special relationship may be said to exist (see generally, Tango v Tulevech, 61 NY2d 34, 40, supra; Miller v State of New York, 125 AD2d 853, lv denied 69 NY2d 608; but see, R.B. v County of Orange, 220 AD2d —, 1995 NY Slip Op 8616 [2d Dept, Oct. 2, 1995]). It does not necessarily follow, however, that where an injured party is attempting to impose liability upon a governmental entity based upon an official's failure to perform a ministerial act, the injured party must also establish the existence of a special relationship. To be sure, in many instances where a special relationship is found to exist, the underlying act or conduct at issue is indeed ministerial in nature (see, e.g., De Long v County of Erie, 60 NY2d 296, supra), but we are aware of no case law

imposing upon an injured party the rule now advanced by Justice Mercure. As there is, however, ample authority for imposing liability upon the State based upon the negligent performance of a ministerial act (*see, e.g., Marx v State of New York*, 169 AD2d 642; *National Westminster Bank v State of New York*, 155 AD2d 261, *affd* 76 NY2d 507), we agree with Justice White to the extent that he concludes that claimant could, if need be, pursue his claim against the State based solely upon Mariotti's negligent performance of a ministerial act.

■ In conclusion, the State's enactment of the detailed and comprehensive statutory scheme at issue which, by its very terms, was designed to protect a discrete and limited class of individuals, establishes, as a matter of law, the existence of a special relationship between the State and claimant's children, thereby obviating the need for claimant to establish the contact and reliance elements of the special relationship test, and Mariotti's failure to competently perform the ministerial act at issue, if deemed to be a proximate cause of the injuries suffered by claimant's children, may form a basis for imposing liability upon the State. Accordingly, the State's motion for summary judgment was properly denied. Similarly, we do not believe that claimant is entitled to summary judgment at this juncture, as the record before us does not establish, as a matter of law, that the failure to report the abuse to the appropriate local CPU was a proximate cause of Aaron's death and Jennifer's injuries. Thus, resolution of this issue must await a trial.[7]

MERCURE, J. (concurring). While concurring in result, because I disagree with my colleagues' implicit conclusion that

---

7. Although we agree with Justice White that our holding today *potentially* exposes the State to liability each time a call is placed to the SCR hotline, it must be remembered that whenever such a call is made, there must be an initial determination as to whether the allegations "could reasonably constitute a report of child abuse or maltreatment" (Social Services Law § 422 [2] [a]). As such an inquiry necessarily involves the exercise of "reasoned judgment" (*Tango v Tulevech*, 61 NY2d 34, 41, *supra*), liability cannot attach unless and until the allegations are deemed to constitute a report of abuse or maltreatment. Moreover, even assuming this threshold requirement is met, the potential claimant still must establish proximate cause, which may well prove difficult. Finally, as the statute plainly reflects a willingness on the part of the State to assume responsibility for administering the SCR and monitoring the provision of the child protective services provided by the local CPUs, our holding today does not, in our view, impose upon the State any greater duty or liability than it voluntarily undertook or assumed in the first instance.

the special relationship and ministerial act doctrines are alternative theories of liability, I am required to write separately. In my view, these so-called "doctrines" are neither "alternative" nor are they "theories of liability". To the contrary, they are nothing more than factual theories advanced in avoidance of the alternative grounds raised by the State in support of its defense of sovereign immunity. The distinction is critical to a proper determination of the issue of whether plaintiff need establish both "doctrines" in order to defeat the State's motion for summary judgment.

Although the State has waived the immunity previously enjoyed by virtue of its sovereign status and consented to be sued for the torts of its officers and employees (see, Court of Claims Act §§ 8, 9 [2]), the courts have fashioned a number of exceptions to the general rule of governmental liability, grounded and classified on the basis of the specific act or omission out of which the injury is claimed to have arisen and the capacity in which the act or failure to act occurred (see, Weiner v Metropolitan Transp. Auth., 55 NY2d 175, 182; see also, 1 NY PJI 2d 471-480 [1996 Supp] [for an excellent treatment of the various established exceptions to the general rule of governmental liability]). In defense of the instant claim, the State contends the applicability of two of these established exceptions.

First, based upon the theory that the proper allocation of public resources and available police services is a matter for the executive and legislative branches to decide, an exception has developed with regard to claims arising out of security breaches, where a member of the public is exposed to danger as the result of a governmental entity's failure to protect against external hazards, particularly criminal activities (see, Riss v City of New York, 22 NY2d 579; see also, Kircher v City of Jamestown, 74 NY2d 251 [claim based upon police officer's failure to "call in" witnesses' report of abduction]; Bonner v City of New York, 73 NY2d 930 [school teacher assaulted on playground]; Miller v State of New York, 62 NY2d 506 [State University student raped in her dormitory]; De Long v County of Erie, 60 NY2d 296 [claim based upon negligent processing of and response to a 911 emergency call]; Florence v Goldberg, 44 NY2d 189 [claim based upon failure to provide police officer to serve as school crossing guard]). This exception to the general rule, absolving the government from liability for decisions as to the allocation of the limited resources available for police protection, has its own court-made exception, which will permit

recovery in cases where a "special duty" or "special relationship" is shown to exist, a matter discussed in some detail by the majority.

Second, the State argues an entirely separate exception to the general rule of governmental tort liability, "generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability" (*Arteaga v State of New York*, 72 NY2d 212, 216), which comes into play in cases arising out of the performance of governmental regulatory activities involving the exercise of judgment or discretion (*see, e.g., Eiseman v State of New York*, 70 NY2d 175 [acts of correction officials and parole supervisors in establishing the level of restrictions on and the degree of supervision for a released inmate]; *Tarter v State of New York*, 68 NY2d 511 [parole release decisions of Board of Parole]; *Tango v Tulevech*, 61 NY2d 34 [judgment of county probation officer concerning custody of a child]). In such a case, the question of whether the State is entitled to immunity first requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment (*see, Mon v City of New York*, 78 NY2d 309, 313). If so, it must then be determined whether the conduct giving rise to the claim is related to an exercise of that discretion (*supra*). Obviously, this exception will not apply in a case where the actor's conduct giving rise to the claim did not involve an exercise of discretion, i.e., was ministerial in nature.

Two important points necessarily emerge from the foregoing analysis. First, claimant's assertions that there existed a special relationship and that the act giving rise to liability was purely ministerial are not part of his claim against the State. Rather, these positions are merely advanced in an effort to defeat the State's defense of sovereign immunity. Second, because it need establish its immunity but once, the State will defeat the claim if it can demonstrate the applicability of either one of the foregoing exceptions to the general rule of governmental liability. Stated in the converse, claimant may prevail only by defeating both of the State's alternative theories founded upon the doctrine of sovereign immunity.

For the same reason, in the highly analogous case of *Miller v State of New York* (125 AD2d 853, *lv denied* 69 NY2d 608), this Court, having determined the validity of the State's claim of immunity based upon the performance of a discretionary act,

found it unnecessary to consider the alternative theory based upon the absence of any special relationship (*supra,* at 855). Under the circumstances, I cannot understand the majority's citation to that case for the very opposite proposition. Nor do I understand Justice White's reliance upon this Court's decision in *Davis v State of New York* (212 AD2d 939), where the "ministerial act" issue was addressed only after the State's claim of governmental immunity based upon the absence of a duty of special care had been defeated.

In the final analysis, neither of the other writings in this matter has cited a case holding or even suggesting that the special relationship and ministerial act "doctrines" are alternative theories of liability. To the contrary, the factual setting of the instant case cannot be meaningfully distinguished from that presented in *De Long v County of Erie* (60 NY2d 296, *supra*). There, as here, the person who took the complaint, in the performance of a ministerial act, referred it to the wrong municipality. The Court of Appeals held, however, that there could be no recovery in the absence of a special relationship.

Nonetheless, because I agree with the majority that claimant succeeded in defeating both of the alternative theories founded upon the defense of sovereign immunity, I would affirm the grant of partial summary judgment in favor of claimant.

WHITE, J. (concurring in part and dissenting in part). I concur with the majority's analysis that Kim Mariotti's failure to transmit the report to the appropriate county Child Protective Unit is a ministerial act to which governmental immunity does not attach. I disagree, however, with its conclusion that a special relationship existed between claimant's children and the State solely by virtue of the enactment of Social Services Law, article 6, title 6.

As outlined in the majority opinion, four elements must be satisfied in order to invoke the special relationship rule. While the Court of Appeals in *Sorichetti v City of New York* (65 NY2d 461) relaxed the direct contact requirement, it has essentially limited *Sorichetti* to its facts, noting in *Cuffy v City of New York* (69 NY2d 255) that its deviation from said requirement in *Sorichetti* was attributable to the preexisting order of protection, the close relationship between the interests of the mother and those of the child, as well as the fact that the mother's contact with the police had been initiated solely for the purpose of obtaining protection for her helpless child (*see, Kircher v*

*City of Jamestown*, 74 NY2d 251, 257 [where the Court reiterated its reliance on the outstanding order of protection as the basis for its relaxation of the direct contact requirement in *Sorichetti*]). Despite being presented with sympathetic circumstances, the Court since *Sorichetti* has declined to relax the direct contact requirement (*see, Merced v City of New York*, 75 NY2d 798 [where neighbors of the decedent, killed by her husband, called the 911 emergency number to request assistance for her]; *Kircher v City of Jamestown, supra*).

Although this case involves young children unable to act on their own behalf, the additional factors present in *Sorichetti* militating in favor of relaxing the direct contact requirement, particularly that of prior governmental involvement, are not present here. Additionally, the adoption of the majority's rule would expand the scope of the State's duty to abused children by exposing it to potential liability every time a call was placed to the child abuse hotline. In this regard, I note that other legislation regarding the abuse and neglect of the elderly could lead to additional liability being imposed on the State (*see,* Social Services Law art 9-B [Adult Protective Services]; *see also,* L 1995, ch 395 [regarding detection and prevention of abuse and neglect of the elderly]).

For these reasons, I would affirm the Court of Claims' dismissal of the claim to the extent it is premised upon the special relationship rule, leaving claimant to prosecute this claim under the theory that his damages flowed from the State's failure to perform a ministerial act, a separate aspect of the governmental immunity doctrine (*see, Cooper v City of New York*, 81 NY2d 584, 594 [Titone, J., dissenting]; *see also, Mon v City of New York*, 78 NY2d 309, 313; *Haddock v City of New York*, 75 NY2d 478, 485; *Tango v Tulevech*, 61 NY2d 34, 40). I also note the recent case of *Davis v State of New York* (212 AD2d 939), involving a failure to promptly execute a parole violation warrant, where this Court denied summary judgment finding that a question remained as to whether the execution of the warrant could be considered a ministerial act for which the State would not enjoy immunity.

CARDONA, P. J., and PETERS, J., concur with CREW III, J.; MERCURE, J., concurs in a separate opinion; WHITE, J., concurs in part and dissents in part in a separate opinion.

Ordered that the order is affirmed, with costs to claimant.