Smith, J.
(dissenting). Because I believe that plaintiff Edward G. Lauer has adequately pleaded a prima facie case for negligent infliction of emotional distress, I dissent.
On August 6, 1993, plaintiff and his wife took their three-year-old son Andrew to the hospital because he was gasping for breath. After an examination, the hospital sent the child home. The next morning the child was dead. Defendant Eddy Lilavois, a medical examiner from the Office of the Chief Medical Examiner (OCME), conducted an autopsy and concluded that the child was murdered by “blunt injuries of [the] neck and brain.”
An investigation by the District Attorney focused almost immediately on plaintiff. On August 31, 1993, however, approximately three weeks after the initial autopsy, Dr. Angeline R Mastri and Dr. Lilavois examined Andrew’s brain and *106 concluded that he died of natural causes from an aneurysm due to dysplasia of a branch of the left posterior cerebral artery. On that day, Drs. Lilavois and Mastri prepared a neuropathology report reflecting the accurate cause of Andrew’s death. The report was filed with the OCME on October 14, 1993. Neither the New York City Police Department nor the District Attorney’s office was apprised of the OCME’s new findings regarding the true cause of Andrew’s death. The Lauers were also not informed.
Police investigators allegedly attended Andrew’s funeral, informing plaintiffs friends and family that plaintiff had “twisted his son’s neck” and had “killed his son.” Many of plaintiffs friends and family became openly hostile towards him, and his wife sued him for divorce. In addition, plaintiff was forced to sell his home because he was ostracized by his neighbors.
In March 1995, approximately 17 months after the OCME discovered the true cause of death, the New York Daily News began an inquiry into the status of the police investigation. The newspaper learned from the OCME that “coroners had long ago reclassified Andrew’s death as natural.” It was only upon the Daily News’ exposé that the authorities learned that Andrew’s death was no longer considered a homicide. The OCME subsequently amended the autopsy report and prepared an amended death certificate.
Plaintiff commenced this action against the City of New York, the OCME, Dr. Lilavois, and the NYPD (collectively, defendants), sounding in intentional and negligent infliction of emotional distress, defamation and civil rights violations. Supreme Court granted defendants’ motion to dismiss the complaint except for the causes of action alleging intentional infliction of emotional distress and negligent infliction of emotional distress. On defendants’ appeal and plaintiffs cross appeal, the Appellate Division determined that only the cause of action for negligent infliction of emotional distress was viable.
A.
On this appeal, defendants contend that by failing to provide the District Attorney with an amended autopsy report, Dr. Lilavois and the OCME breached a governmental duty owed to the public at large, not a duty owed directly to plaintiff, and thus they are protected by governmental immunity. Plaintiff counters that Dr. Lilavois’ omission was a breach of a ministerial function, for which governmental immunity does not exist.
*107 In my view, plaintiff has adequately alleged the breach of a ministerial duty for which defendants may be held liable in damages.
Although municipalities in this State have long surrendered their common-law tort immunity for the misfeasance of their employees, limitations exist regarding the scope of municipal tort liability. Generally, governmental immunity will attach when the official act of a municipal employee “involves the exercise of discretion or expert judgment in policy matters” and a municipal defendant will not be liable in damages for injuries sustained, even if resulting from negligence or malice (Haddock v City of New York, 75 NY2d 478, 484). If the action is exclusively ministerial, however, the municipality “will be liable if [the action] is otherwise tortious and not justifiable pursuant to statutory command” (Tango v Tulevech, 61 NY2d 34, 40).
Although distinguishing between an act of discretion and a ministerial function may sometimes be difficult, this Court has articulated a basic rule which serves as a guidepost in helping courts make the distinction. “[D]iscretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result” (id., at 41).
B.
Turning to the actions of Dr. Lilavois, a medical examiner’s conclusions after an autopsy regarding an individual’s cause of death involve the exercise of reasoned professional judgment and discretion. Thus, the doctor’s initial erroneous conclusion that Andrew died from “[b]lunt injuries of the neck and brain” and his characterization of the child’s death as a homicide would be cloaked with governmental immunity. In contrast, Dr. Lilavois’ duty to notify prosecuting authorities of an error in the original autopsy diagnosis stems from a duty delineated by the New York City Charter § 557 (g), which states:
“The chief medical examiner shall keep full and complete records in such form as may be provided by law. The chief medical examiner shall promptly deliver to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality.”
*108 Compliance with the requirements of section 557 required no exercise of reasoned judgment on the part of Dr. Lilavois and the Appellate Division properly deemed the omission a breach of a ministerial function.[1]
Defendants’ contention that even if Dr. Lilavois failed to perform a ministerial function, he breached a duty only to the public at large and not to plaintiff individually should be rejected. Municipal immunity presupposes an exercise of discretion while performing a governmental function (Cuffy v City of New York, 69 NY2d 255). We have articulated that the policy rationale underlying governmental immunity “reflects a value judgment that — despite injury to a member of the public — the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury” (Haddock v City of New York, 75 NY2d, supra, at 484; Mon v City of New York, 78 NY2d 309, 313). Where, however, a municipal employee fails to perform a ministerial task, liability should attach, so long as a common-law duty running from the municipality to the individual claiming injury is established.
C.
With regard to whether the OCME owed a duty to plaintiff to accurately report the status of Andrew’s death, general principles of negligence law are instructive. Liability sounding in negligence must first be premised upon a finding of a legal duty owed by the defendant to the plaintiff (D’Amico v Christie, 71 NY2d 76, 87). The concept of legal duty merges logic, science and public policy to determine whether the plaintiffs interests are entitled to legal protection against a defendant’s conduct (Turcotte v Fell, 68 NY2d 432, 437; De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055). While foreseeability of injury does not solely determine the existence of a duty, that rule must be balanced with the well-established principle that “[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation” (Palsgraf v Long Is. R. R. Co., 248 NY 339, 344). In other words, foreseeability of injury and duty are not two discrete concepts when considering li *109 ability grounded in negligence. Thus, “ ‘whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger’ ” (Havas v Victory Paper Stock Co., 49 NY2d 381, 386, quoting Heaven v Prender, 11 QBD 503, 509, Britt, MR [1883]).
Here, once Dr.. Lilavois characterized Andrew’s death as a homicide and shortly thereafter learned that Andrew died of natural causes, a duty arose to plaintiff, an individual targeted by the investigation, resulting from the erroneous report. Dr. Lilavois knew that characterizing Andrew’s death as a homicide was the impetus for the police investigation. Moreover, he allegedly knew that plaintiff was suspected in the homicide. Thus, the risk of failing to communicate the exculpatory evidence to the proper authorities, evidence which Dr. Lilavois and the OCME alone possessed, was reasonably perceivable. Dr. Lilavois knew or should have known that failing to exercise reasonable care under these circumstances would cause injury to plaintiff.
Although a court, exercising extreme caution, may impose a legal duty where none previously existed (Pulka v Edelman, 40 NY2d 781, 786), imposing a duty under these circumstances would not lead this Court into novel, uncharted waters of legal consequences. For example, liability in negligence may rest on a defendant’s nondisclosure, which misleads a third party and results in injury or damage to a plaintiff predicated on the fact that “the misrepresentation or nondisclosure has led the person to whom it was made to forego action that might otherwise have been taken for the protection of the plaintiff’ (Eiseman v State of New York, 70 NY2d 175, 187). This Court has stated that:
“Liability in such cases arises only where there is a duty * * * to give the correct information * * *. There must be knowledge, or its equivalent that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous he will because of it be injured in person or property. Finally, the relationship of the parties * * * must be such that * * * the one has the right to rely upon the other *110 for information, and the other giving the information owes a duty to give it with care” (International Prods. Co. v Erie R. R. Co., 244 NY 331, 338; see also, Eiseman v State of New York, supra, at 187-188).
Applying these principles to this case, defendants owed a duty to plaintiff upon which liability may be predicated. It is undisputed that Dr. Lilavois breached his duty to “promptly deliver to the appropriate district attorney copies of all records relating to” Andrew’s death (NY City Charter § 557 [g]). Moreover, there can be no question that Dr. Lilavois knew (1) of the importance and seriousness of communicating correct information to the proper authorities regarding the actual cause of Andrew’s death, (2) that the authorities were acting upon his initial assessment of the cause of death as a homicide, and that they relied upon the OCME to act with due care in deciphering Andrew’s cause of death, and (3) that an error of this kind would lead to an unnecessary homicide investigation and possibly an erroneous arrest. Thus, the nature of the relationship between the OCME and the District Attorney was such that the District Attorney had the right to rely on the other for information regarding criminality in death. Once Dr. Lilavois and the OCME learned of the true cause of Andrew’s death, they had a duty to act with reasonable care to inform the authorities, knowing that nondisclosure would result in further injury to plaintiff in this case.
In Eiseman v State of New York (70 NY2d 175, supra), this Court considered whether the State owed a legal duty to the estate of a decedent killed by an ex-felon admitted into a government-sponsored college program after a prison physician inaccurately completed a medical report indicating that the ex-felon had no history of mental instability. This Court declined to impose a duty on the State, concluding that the physician’s duty to accurately report the ex-felon’s medical history ran only to the college and not the entire college community. Moreover, questions existed regarding whether the physician had in fact withheld any information personally known to him and whether the physician was aware of or should have been aware that the information would be relied on by the decedent, or other students, as his representation of the ex-felon’s medical history (id., at 189).
The facts of this case hardly mirror the circumstances in Eiseman. Dr. Lilavois knew that an investigation into Andrew’s death was pending pursuant to his initial report and he alleg *111 edly knew that plaintiff was a suspect. Thus, the possibility of danger to plaintiff here was so “apparent as to entitle him to be protected” (Palsgraf v Long Is. R. R. Co., 248 NY 339, 345, supra).
The imposition of a duty in this case is further supported by this Court’s decision in Crosland v New York City Tr. Auth. (68 NY2d 165). In that case, the Court ruled that the New York City Transit Authority owed a duty to one of its passengers who was beaten to death by hoodlums as Transit Authority employees stood by and did nothing. In holding that “Matching someone being beaten from a vantage point offering both safety and the means to summon help without danger is within the narrow range of circumstances which could be found to be actionable” (supra, at 170), the Court rejected the Authority’s governmental immunity-based argument.[2] Specifically, the Court stated that because the Authority’s employee unreasonably failed to summon aid though he could have done so without risk to himself, such failure was beyond the boundary of immunity articulated in Weiner v Metropolitan Transp. Auth. (55 NY2d 175). Instead, balancing several policy considerations, the Court considered compensation for the victim and general deterrence, and concluded that the Authority had “failed to insure that its employees observe not only its own regulations, but also common standards of behavior” (Crosland v New York City Tr. Auth., supra, at 170).
Although the majority points out that the Transit Authority in Crosland was liable pursuant to Public Authorities Law § 1212 (3), that statute merely states that the Transit Authority “shall be liable for * * * the negligence of’ a duly appointed employee. In holding the conduct of the Transit Authority actionable, the Court implicitly decided the legal question of duty, and determined that the Transit Authority owed a duty to the plaintiff.
Indeed, Crosland reflects the flexibility of this Court to balance considerations of social welfare and public interest against the boundaries of tort responsibility. The concept of duty is not static. As part of the common-law process, courts may indeed fashion the scope of duty “by balancing factors, including the *112 reasonable expectations of parties and society generally, the proliferation of claims * * * disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability” (Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 586).
In this case, like the Transit Authority employee in Crosland, Dr. Lilavois’ ministerial, mechanical task of notifying the authorities required nothing more than minimal efforts to avert a grave injustice. Plaintiff had a right to reasonably expect that the OCME perform its ministerial duties with reasonable care and in compliance with statutory mandates. Indeed society as a whole has the right to reasonably expect the same, particularly where, as here, misfeasance has such far-reaching implications. The imposition of liability here would not therefore contravene public policy. On the contrary, liability under these circumstances would affirm the reasonable expectations of both the parties and society. Moreover, it would emphasize to those who fail to use care that there are consequences for their actions.
Finally, by causing a criminal investigation, Dr. Lilavois initiated a chain of events that created a danger to plaintiff. Subsequently, upon realizing that he created an unreasonable danger to plaintiff, a targeted suspect of the investigation, Dr. Lilavois had a duty to exercise reasonable care to prevent the harm (Moch Co. v Rensselaer Water Co., 247 NY 160, 167; Restatement [Second] of Torts § 321; see also, id., illustration 2).
D.
This Court has stated that, absent a special relationship, “a municipality does not owe a duty to its citizens in the performance of governmental functions, and thus courts will not examine the ‘reasonableness’ of the municipality’s actions” (Sorichetti v City of New York, 65 NY2d 461, 468). There can be no serious dispute here that Dr. Lilavois’ negligent act was ministerial in nature. Thus, plaintiff need not show the existence of a special relationship to establish defendants’ liability (see, Boland v State of New York, 218 AD2d 235). Nevertheless, the facts demonstrate that a special relationship between defendants and plaintiff existed.
In Cuffy v City of New York (69 NY2d 255, 260), this Court delineated the four elements of a special relationship, which are: “(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality’s *113 agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) that party’s justifiable reliance on the municipality’s affirmative undertaking.”
These four factors are sufficiently alleged in this case. The OCME assumed control of Andrew’s remains and undertook an affirmative duty, through its actions, to correctly determine the cause of death. Once labeling the death a homicide, Dr. Lilavois and the OCME knew that such characterization would prompt a police investigation. Setting an investigation into motion, the doctor and the OCME knew or should have known that any failure to come forth with exculpatory information could unnecessarily prolong the police investigation, causing harm to the limited number of individuals suspected of the crime. Significantly, Dr. Lilavois and the OCME exclusively possessed the exculpatory evidence.
The “direct contact” element, “which is closely related to the element of reliance, serves to rationally limit the class of persons to whom the municipality’s duty of protection runs and exists” (Kircher v City of Jamestown, 74 NY2d 251, 257). While direct contact is necessary, this Court has not been overly rigid in its application, taking the particularities of each case into consideration (Cuffy v City of New York, 69 NY2d, supra, at 261-262). For example, in Sorichetti v City of New York (65 NY2d 461, supra), this Court permitted contact between the mother of an injured infant and the police to substitute for contact directly between the police and the infant (compare, Kircher v City of Jamestown, supra [direct contact not satisfied where two strangers to plaintiff notified police of plaintiff’s danger]).
Here, plaintiff alleges that he had extensive contact with the OCME. While the extent of the contact is not clear from the record, this appeal is before us through a motion to dismiss. Given the procedural posture, plaintiff has been foreclosed up to this point from conducting discovery. Presumably, an agent from the OCME came to retrieve Andrew’s body from plaintiffs home. However, what the record does establish is that Andrew’s body came into direct contact with the OCME and that plaintiff is Andrew’s next of kin. Under the circumstances of this case, Andrew’s body, in which plaintiff maintained a cognizable property interest (see generally, Darcy v Presbyterian Hosp., 202 NY 259), is another link between plaintiff and the OCME, and sufficiently distinguishes plaintiff from the public at large (see, Kircher v City of Jamestown, supra, at 257-258).
*114 Finally, the key element of justifiable reliance is adequately alleged. Indeed, plaintiff had no choice but to rely on the OCME for an accurate assessment of Andrew’s cause of death. Furthermore, plaintiff relied on the OCME to correctly report to the authorities any information in this regard. Even if defendant’s initial conclusion regarding the nature of Andrew’s death is shielded from liability, at a minimum, plaintiff had the right to rely upon the OCME to competently perform its statutorily mandated duties.
The conclusion that a special relationship exists does not mean that plaintiff may automatically recover. It remains a question for the trier of fact as to whether plaintiff has established the claims raised in the complaint.
E.
One to whom a duty of care is owed may recover for injuries sustained as a result of negligently caused psychological trauma so long as consequential physical manifestations of trauma exist (Johnson v State of New York, 37 NY2d 378, 381). Requiring physical manifestations, rather than emotional symptoms alone, is thought to provide an index of reliability (id.). This Court has recognized several exceptions to the rule requiring physical symptoms, however. One may recover for the emotional harm resulting from (1) the negligent transmission by a telegraph company of a message announcing death (id., at 382), (2) the negligent misinformation to a next of kin regarding the death of a relative (id.; see also, Rotondo v Reeves, 153 Misc 2d 769 [father could maintain action to recover damages for emotional distress from coroner’s mistaken identification of family’s pet rabbit’s remains as those of the child and the consequent delay in discovering the true remains]), (3) the negligent mishandling of a corpse (Darcy v Presbyterian Hosp., 202 NY 259, supra), and (4) the denial of access to control the body of a deceased relative (Lando v State of New York, 39 NY2d 803, 805). In those cases, this Court has recognized that there exists “ ‘an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious’ ” (Johnson v State of New York, 37 NY2d, supra, at 382).
The unique circumstances of this case present a sufficient guarantee of genuineness and seriousness to sustain a cause of action for negligent infliction of emotional distress. The record establishes that for 17 months plaintiff was erroneously suspected of the murder of his only son. Plaintiff’s emotional *115 injuries were allegedly the proximate result of Dr. Lilavois’ failure to inform authorities that Andrew’s death was caused by natural circumstances rather than homicide, as initially suspected. Believing that plaintiff was a murderer, his wife divorced him. His family, friends and neighbors shunned him. For close to two years, plaintiff needlessly lived under a cloud of suspicion, allegedly enduring depression and loss of weight caused by the nightmare he lived.
Under the circumstances presented, plaintiff should be given the opportunity to prove his allegations (see, Prosser, Torts § 54, at 330 [4th ed]; see also, Bovsun v Sanperi, 61 NY2d 219, 231; Battalla v State of New York, 10 NY2d 237, 240-242).
For the foregoing reasons, I dissent.

. While New York City Charter § 557 requires the Medical Examiner to report his autopsy findings to the District Attorney, it cannot be disputed that the autopsy report is available to the next of kin (see, e.g., County Law § 677 [3] [b]).

. The Court expressly rejected the plaintiffs argument that the Authority owed the plaintiff a special duty because no evidence of direct contact between Authority agents and decedent existed. Furthermore, the Court ruled that liability to the Authority could not be premised on the alleged breach of Transit Authority rule 85, which imposed a duty higher than the Authority actually owed to decedent.