[795 NYS2d 539]

Sean M. et al., Respondents, v City of New York et al., Appellants, et al., Defendant.

First Department, May 24, 2005

## APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Ronald E. Sternberg* and *Leonard Koerner* of counsel), for municipal appellants.

*Goldstein & Tanenbaum, P.C.*, Carle Place (*Christopher R. Invidiata, Steven I. Brizel* and *Steven F. Goldstein* of counsel), for Louise Wise Agency, appellant.

*Law Offices of Melvin Kreidman*, New Rochelle (*Melvin Kreidman* of counsel), for respondents.

## OPINION OF THE COURT

Tom, J.P.

At issue on this appeal is whether the City of New York and a child protective service, defendant Louise Wise Services (LWS), sued herein as Louise Wise Agency, are insulated by immunity from liability for injuries allegedly sustained by children, both in connection with their judicial placement into the foster care system and subsequently, while in the custody of various foster homes. This Court concludes that although these defendants are insulated from liability with respect to the initial placement, they are answerable for any injuries sustained as the result of the failure to adequately supervise foster parents to ensure that children entrusted to their care are not subjected to mistreatment.

Plaintiffs Deborah (Debbie) and Sean M. are siblings, born on December 29, 1976 and January 16, 1980, respectively. They were removed from the custody of their natural parents in February 1982 after it was determined that the five-year-old Debbie had contracted gonorrhea of the throat. The children were first placed with defendant Catholic Guardian Society and, after approximately two months, were transferred to the custody of defendant LWS. At her deposition, Debbie testified, inter alia, that

in the first foster home, she was kept in her room "hour after hour." In the second home, she was beaten and pushed into a glass, cutting her wrist; the foster mother told Debbie to say that she had fallen off a bicycle. Ms. Vasquez, the third foster parent, pulled her hair, struck her and routinely confined her to a room; a male child in the same home fondled her, at least once, between the legs. Debbie was then between five and seven years old. In another home on Long Island, the foster parent was not abusive, but the older children used to have "oral sex parties" with Debbie. She was ultimately returned to her mother's home, where she was subjected to constant physical abuse by her mother and stepfather.

The complaint, dated September 5, 1985, alleges that plaintiffs were subjected to physical and sexual abuse, both within and outside the foster care system. The first and second causes of action allege that the City of New York and its agencies, the Human Resources Administration and the Department of Social Services (collectively, the City), failed to act on reports of abuse and neglect received since January 1977 by taking timely and appropriate action to remove, respectively, plaintiff Debbie M. and plaintiff Sean M. from the custody of their biological parents. The third and fourth causes of action allege that from the time they were placed in foster care in February 1982 until March 1984, plaintiffs were subjected to abuse and neglect in a series of foster homes and were denied adequate medical care. It is further alleged that after Family Court returned them to their mother's home, plaintiffs were subjected to further abuse and neglect. The complaint asserts that defendants breached their duties to investigate complaints of abuse and neglect, to provide a clean and safe environment for the children and to furnish appropriate medical treatment.

This litigation has a long and tortuous history. Plaintiffs filed a bill of particulars in 1985 and a further bill in 1986. The City filed a bill of particulars in 1994, and defendant LWS filed its bill of particulars in 2000. It appears that no depositions were conducted until 1991 and that plaintiffs were not deposed until 1999.

The instant motions to dismiss the complaint were interposed in March 2002. All defendants contended that they were subject to statutory immunity pursuant to Social Services Law § 419. Defendant LWS also sought dismissal on two additional grounds: that plaintiffs failed to comply with discovery demands (CPLR 3124, 3126), particularly with respect to deposition testimony,

and that the evidence failed to demonstrate LWS knew or should have known that the foster families with whom it placed plaintiffs were unfit. In addition to statutory immunity, the City maintained that it was immune from liability under New York common law.

Supreme Court reserved decision on so much of the motions as sought dismissal for plaintiffs' failure to comply with discovery demands. The court granted the motion of defendant Catholic Guardian Society, dismissing the complaint as against it on the ground that there is no evidence that any complaints were made against said defendant regarding the care of the then infant plaintiffs during the time period covered by the complaint. The court denied the motions of the City and LWS as to their claims of immunity.

On appeal, the City and LWS continue to maintain that they are immune from liability. LWS now advances, as an additional ground for reversal, the prejudice that would be sustained if it were required to defend an action which, as supplemented by plaintiffs' bill of particulars, involves events that took place between 1980 and 1994. It also asserts that Supreme Court improperly entertained plaintiffs' affidavits of merit, submitted after LWS had submitted its reply papers (citing *Schultz v 400 Coop. Corp.*, 292 AD2d 16 [2002]). Moreover, LWS maintains that plaintiffs' affidavits ''set forth only speculation as to the alleged acts of abuse.''

We note that this case was originally delayed as the result of motion practice with respect to the representation of plaintiffs[1] and that further delay has been occasioned by the incarceration, since May 1997, of plaintiff Debbie M.[2] In any event, insofar as LWS's motion for dismissal sought relief by reason of delay, it was directed solely at plaintiffs' failure to respond to its discovery demands; the prejudice that might be sustained as a result is a contention raised for the first time on appeal. Since a party may not ''argue on appeal a theory never presented to the court of original jurisdiction'' (*Recovery Consultants v Shih-Hsieh*, 141 AD2d 272, 276 [1988], citing *Huston v County of*

1. In 1988, plaintiffs' attorney was relieved on the ground that his role as guardian ad litem was a conflict of interest with his capacity as counsel.

2. The indictment charged that, on May 22, 1997, while engaged in the robbery of an automobile, Debbie M. shot the driver, an off-duty police officer, with a Tech 9 pistol, causing his death. She subsequently pleaded guilty to manslaughter in the first degree in full satisfaction of the indictment, receiving an indeterminate sentence of 10 to 20 years. She is presently incarcerated at the Bedford Hills Correctional Facility.

*Chenango*, 253 App Div 56, 60-61 [1937], *affd* 278 NY 646 [1938]), this issue is not preserved for review.

As to the affidavits submitted by plaintiffs after defendants' reply papers had been served, it is settled that such material is not to be given any consideration (*see Constantine v Premier Cab Corp.*, 295 AD2d 303, 304 [2002]; *Voytek Tech. v Rapid Access Consulting*, 279 AD2d 470, 471 [2001]; *see also Migdol v City of New York*, 291 AD2d 201 [2002]). However, the record is replete with allegations of abuse. Thus, the preclusion of the affidavits does not render inadequate plaintiffs' opposition to the dismissal motions (*see Sanford v 27-29 W. 181st St. Assn.*, 300 AD2d 250, 251 [2002]). Finally, we note that LWS has abandoned its argument that the evidence is insufficient to establish it knew or should have known that plaintiffs were being subjected to abuse and neglect during the time they were in foster care.

While parties are accorded considerable latitude in charting their procedural course before the courts (*Stevenson v News Syndicate Co.*, 302 NY 81, 87 [1950]; *see also Mitchell v New York Hosp.*, 61 NY2d 208, 214 [1984]; *Matter of Malloy*, 278 NY 429 [1938]), they are bound by the consequences attendant upon the exercise of that prerogative (*see Katz v Robinson Silverman Pearce Aronsohn & Berman*, 277 AD2d 70, 73 [2000]; *Schultz*, 292 AD2d at 21-22). As Supreme Court noted, this case has been distinguished by "unconscionable delay." Significantly, in the nearly two decades this matter has been pending, plaintiffs never moved to amend their complaint (CPLR 3025) to encompass additional acts of alleged negligence subsequent to March 1984, the last incident alleged in the complaint. In view of the passage of so much time, extensive discovery and the lack of notice to defendants of the additional transactions and occurrences (*see* CPLR 203 [f]), it would clearly be improvident to permit plaintiffs to expand their pleadings to add facts within their personal knowledge (*Poitier v American Broadcast Cos.*, 61 AD2d 905 [1978], *appeal dismissed* 44 NY2d 949 [1978] [six-year delay in moving to amend]; *see also Fulford v Baker Perkins, Inc.*, 100 AD2d 861 [1984] [five-year delay]). Therefore, consideration of plaintiffs' allegations of abuse and neglect is properly restricted to the incidents set forth in the complaint—that is, January 1977 to March 1984.

The immunity asserted by the City and LWS must be assessed in light of the two distinct wrongs alleged in the complaint: the failure to respond appropriately to charges that plaintiffs were subjected to abuse and neglect (1) in their own home (first and

second causes of action) and (2) in the foster homes in which they were placed (third and fourth causes of action). The first two causes of action are directed solely against the City which, plaintiffs allege, received numerous complaints that they were being abused but failed in its duty to remove them from the custody of their parents and to institute court proceedings to prevent further abuse and neglect. The third and fourth causes of action are directed against all defendants. It is alleged that defendants breached their duty to investigate complaints made by the children's natural mother and maternal grandmother alleging maltreatment by foster families and that defendants generally failed to provide a safe environment for the children, including adequate medical care.

This case has wound its way, glacially, through the litigatory process over a period of nearly 20 years, during which a record exceeding 1,600 pages has been amassed. Despite the volume of information presented, however, relatively little is known about the circumstances of the abuse to which plaintiffs were subjected. Abuse definitely occurred because the young Debbie M. was diagnosed with a venereal disease before she was old enough to attend kindergarten. The source of the abuse the children experienced while in their mother's care, however, is elusive. The mother blamed her husband, the father blamed his wife, and the maternal grandmother blamed both the father and her own daughter. Over the course of approximately four years, despite the detailed investigation of numerous allegations emanating from all three of these adults and directed, variously, at each parent, social workers were unable to confirm a single instance of abuse or neglect.

The circumstances leading up to the City's initiation of proceedings to remove plaintiffs from their mother's care are well chronicled. At the time the first allegation of mistreatment was received in January 1977, plaintiffs' parents were receiving counseling under the auspices of Manhattan Family Court, where they were monitored by the Home Advisory Unit and received court-ordered psychiatric evaluation. However, no details have been provided. What is known about the family is contained largely in records maintained by the Department of Social Services (DSS). Plaintiffs' depositions are also included in the record but, given the tender years of Sean and Debbie, even at the end of the period covered by the complaint (ages four and seven, respectively) and the time that elapsed before their testimony was taken (approximately 15 years later), their recollection of events is understandably lacking in detail.

Plaintiffs' parents, Joseph M. and Deborah K. M. (Ms. M.), were married in New York City on November 13, 1976. Shortly after Debbie's birth, complaints began to surface that the child was being neglected. A social services center received an anonymous telephone call and a subsequent report filed by Debbie's father, expressing concern for the child because of her mother's psychiatric history, which included excessive drinking and an attempt to jump off the George Washington Bridge six years earlier. These complaints were referred for investigation by DSS on January 10, 1977.

When contacted a week later, Ms. M. responded that her husband was "a psychopath," who was presently incarcerated at Rikers Island by order of the Family Court for breaking into her apartment. She denied any truth to the allegations against her but expressed no surprise that her husband had made them, indicating that it was part of his "usual pattern of behavior." She showed the caseworker an order of protection granted by Manhattan Family Court on December 15, 1976 that directed Joseph M. to desist from acts "constituting assault, menacing the petitioner, endangerment, etc."

Over the course of the next few years, Debbie's maternal grandmother, Mrs. Alberta K. (MGM), made numerous complaints relating to her daughter's state of mind and her daughter's treatment of the child, alleging that Debbie was being neglected and mistreated by her mother; that "the mother is just as much of a psychopath as is her husband"; that "the mother is a Dr. Jeckell [sic] and Mr. Hyde type" who "can look you straight in the eye and tell you the biggest lie you can imagine"; that "the mother herself abuses the child . . . mostly a matter of mental abuse"; that the mother refused to take the child to the doctor when Debbie was sick and "hits the child."

After following the family for over two years, the Bureau of Child Welfare decided to close the case. A summary report compiled in connection with the transfer of the case to Family Services in July 1978 notes, "We have investigated the numerous complaints made by the mgm who claims that the mother does not adequately care for the child but have found all such complaints unsubstantiated." The report continues:

"The parents, although they are separated, both blame the mgm as the perpetrator of most of their problems. On the other hand, the mother blames her estranged husband directly—and rightly so

whenever he behaves towards her in a threatening and abusive manner. Both the mother and her husband strongly accuses [sic] the mgm of just wanting to make trouble for them by her constantly making up complaints against them about the child."

The report concludes, "As our investigation has never revealed any actual abuse or neglect towards the child, we have therefore found no basis on which to bring any court action against the parents." A summary report dated March 12, 1979 states, "The primary problem appeared to be unfounded complaints made by the maternal grandmother and the husband," adding, "We have seen no indications of any neglect or abuse, nor do we anticipate that there will be." A contemporaneous note from Debbie's treating physician, Dr. Huang, states that he had "never seen her with any physical evidence of child abuse."

Thereafter, in 1980, Special Services for Children investigated a complaint of child abuse received by telephone from a caller who stated that she was "a neighbor" and who identified herself as "Mrs. Garcia." In the course of the investigation, Mrs. K. made various allegations against Debbie's father:

"that he practices voodoo, that he throws live cats out of the window, that he threatens her life, that he beats her daughter and granddaughter, that he may be involved in drugs, that he raped a daughter of his from his earlier marriage, that he has political connections 'straight up to William Buckley Jr' and so the police cover up for him; that Debbie is terrified of the talk of Satan and voodoo and of her father; that a babysitter . . . who lives in the neighborhood could verify the above."

In a summary of the investigation, the social worker noted, "Worker was never able to contact 'Mrs. Garcia' who allegedly called in complaint of 5/15—no answer at phone # given, different person lives at address given." The social worker "verified that children have received adequate medical care; that there are no unusual marks on their bodies; that there is a close relationship between mother and children." A subsequent medical report received from Dr. Huang again indicated no evidence of mistreatment. The social worker's summary concludes, "Allegations are unfounded; referrals have been rejected; parent is providing satisfactory care; case to be closed."

A subsequent report of abuse, made on September 2, 1980, prompted the agency to notify Ms. M. that "there is some believ-

able evidence that the abuse or mistreatment which was alleged, does exist." However, there is no indication that this allegation had any substance because, as late as November 1981, it was noted that the "children seem well cared for, and adequately supervised by mother, as per last home visit."

On February 14, 1982, Debbie, then five, and Sean, only two, were admitted to Columbia Presbyterian Medical Center after Debbie allegedly told her mother and grandmother that her father had sexually molested her. Debbie was diagnosed with "active oropharyngeal gonorrhea." Both children were treated for lice.

Nothing in the record explains how Debbie contracted gonorrhea.[3] Her deposition testimony states only, "I remember my mother telling me I contracted gonorrhea from my father, but I don't remember any health care provider discussing it with me." Contemporaneous notes made by a caseworker indicate that "she didn't want to talk about what had happened." The account of the incident, given to a child psychiatrist at the hospital, came from Ms. M. and Debbie's maternal grandmother, who told him that the "child's father [had] put his finger up her vagina." However, subsequent "physical examination of Deborah revealed that hymen is intact and that there was no evidence of tearing or bruises around vagina."

On February 18, 1982, an abuse petition was filed in Bronx Family Court. On the following day, Sean and Debbie were placed in a foster home under the supervision of the Catholic Guardian Society in the care of a Mrs. Perez. On April 22, Debbie was transferred to the care of LWS. Sean was placed with LWS on June 11. DSS records indicate that a finding of abuse and neglect was made in Bronx Family Court on July 6, 1982.

The documentation provided by DSS for the time the children spent in foster care is far less detailed than that covering the period they remained in their mother's custody. The children's whereabouts within the foster care system and the dates and reasons for their relocation to different homes are, for the most part, not discernable. The foster family with which the children were originally placed by LWS is not identified, but by March 1983, plaintiffs were in the care of one Anne Marie Rivera.

Meanwhile, allegations of mistreatment continued unabated. A report of April 27, 1983 notes that Ms. M. and Mrs. K. began

---

**3.** Although Ms. M. identified her husband as the cause of Debbie's infection, there is no indication in the record that Joseph M. had gonorrhea or that he was ever prosecuted in connection with this incident of sexual abuse.

to accuse the children's foster mother of abusing Debbie and Sean. The complaints resulted in an investigation by the Suffolk County Confidential Investigations Unit (CIU). In mid-April, the investigator, Mrs. Goldman, "reported she had found no evidence of abuse or neglect in the Rivera home."

One week later, during a visit with the children at the Rivera foster home, Ms. M. noticed a bruise on Sean's head, said to have been sustained "while playing with another child." Ms. M. and Mrs. K. "were convinced Sean had been beaten." Their complaint resulted in another CIU investigation which, again, found no sign of abuse or neglect. Apart from the summary report, however, the record does not disclose who was interviewed or detail what was learned by the investigator.

In July 1983, Ms. M. again complained that her children were being beaten by their foster mother. Ms. M. also alleged that, during one visit to the foster home, Sean suddenly became very cold and developed a high fever, but her demand that he be taken to a hospital was refused. The social worker who investigated this complaint learned from a supervisor for LWS that Sean had been seen by a doctor in Suffolk County, who diagnosed a cold, sore throat and fever.

A report made in December 1983 notes that "Debbie and Sean are having difficulty adjusting to foster care. Their difficulty lies in their moving from one foster home to another and adjusting to each one." It indicates that the children were then in their third foster home and that their "mother has accused all foster parents that these children have had of abuse or neglect." In August 1984, the children were relocated from the "Vasquez" foster home in Suffolk County to the "Alter" foster home in the Bronx. The circumstances surrounding the move are not disclosed.

In August 1984, Bronx Family Court directed that the children be discharged to the custody of their mother on a trial basis. The trial discharge, which began in October 1984, ultimately resulted in a final discharge to their mother's custody, effective February 15, 1985.

At her deposition, Debbie identified her experience in foster care as the reason for her descent into crime. She stated, "I was use [sic] to men touching me and it became a way of life and when I left I went to the streets and started hooking." A psychiatric report prepared in 1998 in connection with the defense to the murder charge against her concluded that she suffered from major depression. The report gives some indication of how her

upbringing impacted upon her mental state. The examining psychiatrist wrote:

> "Her family is a 'museum of pathology,' including severe mental illness, drug abuse, sexual abuse and incest, etc., etc. She has been institutionalized repeatedly and has an extensive psychiatric history dating back to age 11, with multiple suicide attempts. There is an extensive history of alcohol and drug dependence for many years."

With respect to the first two causes of action of the complaint, which assert that the City negligently investigated allegations of abuse and failed to timely remove plaintiffs from an abusive home environment, this Court has held that the City's negligence in the investigation of abuse complaints and the placement of children into foster care constitutes misfeasance in the performance of discretionary duties, which is not actionable (*Matthews v New York City Dept. of Social Servs.*, 217 AD2d 413, 415 [1995], *lv denied* 87 NY2d 812 [1996]). Social Services Law § 419 "affords immunity to those participating in the investigation of child abuse allegations (*see,* Social Services Law § 424; *William M. v Laub,* 149 AD2d 475) as long as they act within the scope of their employment and do not engage in willful misconduct or gross negligence" (*Van Emrik v Chemung County Dept. of Social Servs.*, 220 AD2d 952, 953 [1995], *lv dismissed* 88 NY2d 874 [1996]). The purpose of the statutory immunity is to promote swift and competent investigation of child abuse allegations by a child protective service (*id.*).

The record discloses that Sean and Debbie's immediate family, particularly their maternal grandmother, leveled a constant barrage of charges of abuse and neglect against the biological parents from 1977 to early 1982 which, after extensive investigation by the City, were determined to be unfounded. Prior to Sean and Debbie's placement in foster care in February 1982, neither home visits nor medical examination revealed any indication of abuse or neglect. When clear evidence of abuse was discovered, the City promptly brought a petition to remove the children from their mother's care.

Plaintiffs fail to advance any ground to warrant excluding this case from the qualified immunity afforded by Social Services Law § 419. It is not alleged that any person involved in the investigation acted outside the scope of employment; nor do plaintiffs identify any act of gross negligence. The record provides a substantial factual basis to support the City's deci-

sion to permit the children to remain with their natural mother until abuse became manifest in February 1982. The records showed that child protective services responded to, and investigated, each and every allegation of abuse made by the maternal grandmother. The detailed reports generated by the caseworker demonstrated that the mother, father and children, as well as the grandmother, were interviewed. The worker also attempted to contact neighbors who allegedly witnessed the abuse. Home visits were made and referrals given to the mother to obtain therapy and counseling. The worker obtained a report from the family physician, who noted that during the period of time that Debbie was his patient, he never saw any physical evidence of abuse. The sole evidence submitted by plaintiffs to support their claim was Debbie's recollection of being subjected to abuse. However, due to passage of time and her then tender age, she could not recall whether her family was ever investigated or the extent of any investigation. Thus, her testimony was insufficient to raise a question of fact as to whether the City was grossly negligent in its investigation of the abuse complaints from 1977 to 1982. Finally, the City was entitled to rely on the presumption of good faith afforded by the statute in moving for dismissal of these causes of action (*see Kubik v New York State Dept. of Social Servs.*, 244 AD2d 606, 609 [1997]).

To the extent that the complaint can be construed to allege that the City negligently placed the children in foster care, such placement was the result of a court order and is entitled to judicial immunity (*Mosher-Simons v County of Allegany*, 99 NY2d 214, 219-220 [2002]), which extends to the employees of a child protective service that assists the court in effecting the placement (*id.* at 220-221; *see also Matter of Cromwell v New York City Dept. of Social Servs.*, 239 AD2d 299 [1997] ["placement of the infant with a foster family was a discretionary, nonactionable act"]). In addition, it is settled that Social Services Law § 419 provides no private right of action to a plaintiff alleging negligence in connection with the furnishing of information pertinent to the placement of a child in protective care (*Mark G. v Sabol*, 93 NY2d 710, 722 [1999] [alleging breach of the defendants' governmental responsibility to furnish protective and preventive services]). Thus, plaintiffs' first and second causes of action should have been dismissed.

Plaintiffs' third and fourth causes of action allege negligent supervision of their foster care by defendants, asserting that the City and LWS failed in their statutory duty to provide plaintiffs

with a safe environment from the time they were placed in foster care in February 1982 to March 1984. It has been noted that the statutory immunity conferred by Social Services Law § 419 is not "intended to apply to failures to provide the services required by the Social Services Law" (*id.*). Rather, the immunity conferred by section 419 is confined to the making of reports, the removal of a child from the home and the provision of services pursuant to Social Services Law § 424, which section merely describes the "[d]uties of the child protective service concerning reports of abuse or maltreatment." Thus, plaintiffs' claims that defendants failed to adequately supervise their foster parents to prevent abuse and neglect are not barred by statutory immunity (*contra Lara v City of New York*, 187 Misc 2d 882 [2001]).

As an alternative basis for dismissal, defendant City asserts that its actions are protected by common-law governmental immunity, which attaches when the duties of the defendant's position involve "the exercise of . . . discretion and judgment" (*Mon v City of New York*, 78 NY2d 309, 313 [1991] [immunity for hiring of police officer]). Governmental immunity relieves a public official from liability for the injurious consequences of a discretionary act, even if they result from negligence or malice (*Tango v Tulevech*, 61 NY2d 34, 40 [1983]). However, the Court of Appeals has not yet passed on the precise question presented on this appeal—whether common-law immunity insulates a governmental agency from liability for injuries sustained by a child in foster care (*see Mosher-Simons*, 99 NY2d at 220 n 4; *Blanca C. v County of Nassau*, 65 NY2d 712, 714 [1985]).

Plaintiffs contend that the City's claimed governmental immunity cannot be asserted to bar trial of this matter because common-law immunity can be defeated by a showing that plaintiffs had a special relationship with defendants. Because this is a determination that the law consigns to the trier of fact, plaintiffs argue that a trial is required on this issue.

It is only necessary to establish a "special relationship" when the defendant otherwise owes no duty to the plaintiff (*Cuffy v City of New York*, 69 NY2d 255 [1987]). The elements of a special relationship are: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable

reliance on the municipality's affirmative undertaking" (*id.* at 260). The doctrine is invoked to impose a duty upon a governmental entity where normally none would attach (*see Moch Co. v Rensselaer Water Co.*, 247 NY 160, 168 [1928] [absence of direct duty to plaintiff]) and is ordinarily applied in cases involving the exercise of police power (*see Sorichetti v City of New York*, 65 NY2d 461 [1985]; *Harris v City of New York*, 147 AD2d 186 [1989]). Because the governmental duty to protect extends to the public in general, not to any particular individual (*see Riss v City of New York*, 22 NY2d 579, 581-582 [1968]), it is necessary to establish that a special relationship exists, giving rise to a duty to extend protection to the injured plaintiff so as to afford a basis for recovery. Since there is no question that the City was subject to statutory duties to safeguard plaintiff children while they were entrusted to the care of foster parents (*see Barnes v County of Nassau*, 108 AD2d 50, 54 [1985]), there is no need to establish that defendants undertook an independent duty toward plaintiffs as the result of a special relationship (*see Boland v State of New York*, 218 AD2d 235 [1996]). Thus, there is no need, as urged by plaintiffs, to submit to the trier of fact the question of whether a special relationship arose.

Recovery against the City and LWS is predicated on their alleged negligent supervision of the foster care services provided by or on behalf of a governmental agency. Plaintiffs rely on the Second Department's decision in *Bartels v County of Westchester* (76 AD2d 517, 522 [1980]), in which it was "charge[d] that the county acted negligently in the selection of the foster parents and in failing to remove the child from the home of the foster parents upon notice of maltreatment of the child by the foster parents." The Court held that undertaking to act in loco parentis did not exempt the county from liability (*id.*). Subsequently, in *Barnes* (108 AD2d at 55), the Court held that "a claim of immunity cannot be raised to bar inquiry into a county's alleged negligent acts in the placement and supervision of a child in foster care and that any claim of negligence relating thereto must be resolved at trial."[4]

There is evidence to support plaintiffs' claim that defendants had actual notice of their mistreatment by successive foster parents, particularly, that defendants were negligent in their selection of foster homes and in their failure to promptly remove

4. Following the Court of Appeals' decision in *Mosher-Simons v County of Allegany* (99 NY2d 214 [2002], *supra*), the placement of a child in foster care is protected by judicial immunity.

the children from a foster home after being notified of acts constituting maltreatment (*see Bartels*, 76 AD2d at 522). There is evidence from which a jury could find that defendants ignored repeated complaints of mistreatment of the then infant plaintiffs and either failed to undertake any evaluation of whether to remove them from a foster home or arrived at the decision to retain them in the foster home in bad faith. The record indicates that from the time the children were placed with LWS, defendants received reports of alleged abuse, and the children were ultimately removed from the subject foster home. However, the extent of any investigation conducted with respect to those complaints and the circumstances that prompted the removal of the children from the various foster homes are not discernable. Thus, we conclude that triable issues of fact preclude summary judgment. In any event, defendants do not contest the sufficiency of the evidence against them, including the proof concerning their actual or constructive notice of any abuse by foster parents toward plaintiffs. Neither do defendants dispute the basis for recovery asserted in the complaint. The only ground advanced on this appeal in support of the dismissal of the complaint is defendants' claimed immunity from liability. Thus, the question to be decided is very narrow, and neither the theory of liability nor the quantum of proof is at issue.

The weight of appellate authority in this state does not recognize governmental immunity where recovery is predicated on negligence in the supervision of care provided by foster parents to a child placed in their custody (*see Merice v County of Westchester*, 305 AD2d 383, 384 [2003]; *Barnes*, 108 AD2d at 54; *Bartels*, 76 AD2d at 522; *see also Doe by Hickey v Jefferson County*, 985 F Supp 66 [ND NY 1997]). This Court agrees that liability may be imposed upon a state or its subdivisions for injuries sustained by children due to negligent oversight of the foster homes that care for them. As the Court observed in *Barnes* (108 AD2d at 54), "[i]t would be anomalous, to say the least, for the Legislature to impose on the county [the duty to care for the welfare of children], which could be performed by other entities, and then for courts to preclude inquiry into the discharge of those duties, even if resulting from negligence or malice." Thus, we conclude that neither the City nor LWS has established a right to immunity in this matter. To the extent that *Ross v City of New York* (302 AD2d 232 [2003]) may be read to the contrary, we overrule it.

Accordingly, the order of the Supreme Court, Bronx County (Patricia Anne Williams, J.), entered on or about October 23,

2003, which, to the extent appealed from as limited by the briefs, denied defendant LWS's motion to dismiss the complaint based on statutory immunity and denied the City's cross motion to dismiss the complaint based on statutory and common-law immunity, should be modified, on the law, to the extent of dismissing the first and second causes of action, and otherwise affirmed, without costs.

SULLIVAN, GONZALEZ and CATTERSON, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about October 23, 2003, modified, on the law, to the extent of dismissing the first and second causes of action, and otherwise affirmed, without costs.