OPINION OF THE COURT
Doris Ling-Cohan, J.
The Facts
Before this court is a case involving what could only be termed as a working mother’s worst nightmare. This negligence claim against the City arises from an egregious incident which allegedly occurred on February 3, 2000, when plaintiff Briana Hall, a three-month old infant, was injured while she was in the custody and care of codefendant, Patricia Theroulde. Defendant Theroulde owned and operated the codefendant facility, First Steps Family Day Care Center.
On December 2, 1997, the New York City Department of Health and Mental Hygiene, Office of Family Day Care Registration (DOH) issued to defendant Theroulde her first certificate of registration as a New York State registered family day-care provider (affirmation of John J. Appell, Esq. in opposition to motion [Appell aff in opp], exhibit 2). The DOH is the New York City agency responsible for issuing registration certificates for family day-care facilities within the City, pursuant to a contract with the New York State Office of Children and Family Services (NYSOCFS). The latter is the state agency responsible for administering the licensing and registration of child day-care facilities pursuant to Social Services Law § 390 and the applicable regulations.
It is undisputed that there were two complaints of child abuse and maltreatment brought against defendant Theroulde in 1997 and 1998. Indeed, when she was interviewed after the incident involving Briana which is the subject of this action, defendant Theroulde admitted that she had been investigated for two prior incidents of maltreatment of children entrusted to her care. The 1997 incident occurred when defendant Theroulde’s ex-husband *924 dipped a child’s hand into a bowl of hot oatmeal, and this had been “indicated for Inadequate Guardianship” (Appell aff in opp, exhibit 6). In an incident which occurred on September 29, 1998, defendant Theroulde or one of her assistants had left a child under their care alone and unattended in or near a neighborhood store for more than one hour before the store proprietor took the child home (Appell aff in opp, exhibit 6).
Further, it is undisputed that the Administration for Children’s Services (ACS) Office of Confidential Investigations (OCI) investigated this incident and notified the DOH Bureau of Day Care that a complaint of “lack of supervision” was “indicated” against defendant Theroulde in a written memorandum dated January 26, 1999[1] (Appell aff in opp, exhibit 6). Nevertheless, incredibly, despite the written report of a recent incident of child maltreatment by defendant Theroulde, DOH routinely renewed her registration as a New York State registered family day-care provider on February 11, 1999 (Appell aff in opp, exhibit 2).
Briana’s mother, plaintiff Charlene McLean, a single working mother, was seeking a safe day-care facility for her infant daughter while she worked full time as a receptionist (affirmation of Gabriele A. Shakeri, Esq. in support of motion [Shakeri aff in support], exhibit I, McLean deposition [McLean dep] at 9-11, 19, 28-29). Ms. McLean initially learned of defendant Theroulde’s day-care home through a conversation she had with defendant Theroulde’s husband, who said that his wife provided babysitting services (McLean dep at 40-41). He gave Ms. McLean his wife’s telephone number (id. at 41).
Instead of immediately placing Briana with defendant Theroulde, however, Ms. McLean decided to research child daycare providers in her neighborhood to make sure that her infant daughter would be cared for in a safe environment. Accordingly, Ms. McLean contacted the ACS Administration for Child Development (ACD) at the suggestion of a friend (id. at 43-44). Ms. McLean stated that she telephoned ACS “[s]o that they could refer me to a licensed, investigated, no complaints babysitter” (id.). When Ms. McLean called ACS, she told the agency employee that she was seeking a “licensed baby-sitter that gets investigated routinely by your office” (id. at 45). Ms. McLean *925 testified that the ACS employee assured her that “[w]e don’t send out information on baby-sitters that have complaints and they are fully investigated and licensed through us” (id. at 46).
Subsequently, Ms. McLean received a list of registered daycare providers in her area from ACS, which included defendant Theroulde (id. at 47-48; Shaken aff in support, exhibit G; Appell aff in opp, exhibit 1). Ms. McLean thereafter telephoned two of the providers on the list from ACS, one of whom was defendant Theroulde (McLean dep at 51-51). After defendant Theroulde told Ms. McLean that she would be willing to care for an infant as young as Briana, Ms. McLean went to interview defendant Theroulde and to inspect her apartment where she cared for children (McLean dep at 52-62). Ms. McLean brought Briana and her mother along with her when she interviewed defendant Theroulde for approximately 45 minutes (id. at 53, 62). Defendant Theroulde was in the apartment along with her three children, the youngest of which was her one-year-old son (id. at 56). Defendant Theroulde showed Ms. McLean her “license” as a day-care provider and assured her that she was investigated either annually or every six months and had no complaints against her (id. at 57-59). Defendant Theroulde told Ms. McLean that she would be caring for four other children besides Briana, who would be the youngest child under her care (id. at 60-61). Defendant Theroulde told Ms. McLean that Briana would sleep either in a playpen or in her son’s crib (id. at 63). Defendant Theroulde gave Ms. McLean two references, whom she believes that she contacted before entrusting Briana to defendant Theroulde’s care in mid-December 1999 (id. at 61-66).
Briana’s initial injury occurred when defendant Theroulde’s one-year-old son pulled Briana off a bed, on which she had been placed by defendant Theroulde, causing Briana to fall from the bed to the floor (McLean dep at 84; Appell aff in opp, exhibit 6). At the time of the incident, defendant Theroulde was in the bathroom bathing one of her other children (Appell aff in opp, exhibit 6). Further injury resulted when defendant Theroulde shook Briana in an alleged effort to revive her. Briana suffered traumatic brain injuries and loss of cognitive function, symptoms indicative of “Shaken Baby Syndrome”[2] (Appell aff in opp, exhibit 6).
*926 Ms. McLean learned that Briana had been injured when she came to pick her up in the afternoon of February 3, 2000 and found an ambulance at defendant Theroulde’s apartment building, with Briana inside on a stretcher (McLean dep at 80-83). The incident resulting in Briana’s injuries was investigated by ACS, specifically by the OCI, which concluded, in pertinent part:
“During the investigation it was discovered that since Ms. Theroulde had two prior indicated cases in 1997 and 1998, she shouldn’t have been licensed as a Day Care Provider in 1999. Also, in this current case, Ms. Theroulde used a lack of judgment by placing Briana on a bed instead of a crib, where she would have been more secured. Also, her shaking the baby cause [sic] further damages in addition to the fall off the bed. Ms. Theroulde’s lack of supervision and inadequate guardianship caused Briana to sustain serious internal head injuries. OCI recommends that Ms. Theroulde’s Day Care Center be closed down to prevent any more children from being abused or maltreated.” (Appell aff in opp, exhibit 6.)
Plaintiffs commenced the instant action in or about September 2000, asserting, among other things, that the City was negligent by issuing a registration certificate to defendant Theroulde’s day-care facility despite prior incidents of child abuse and maltreatment, and by including the day-care facility on a list provided by ACS to Ms. McLean (Shakeri aff in support, exhibit B).[3]
Discussion
In this negligence action, codefendant City of New York moves for an order: (1) granting leave to amend its answer adding the affirmative defense of qualified immunity, pursuant to Social *927 Services Law § 419; (2) pursuant to CPLR 3212, granting summary judgment; or, in the alternative, (3) pursuant to CPLR 3211 (a) (7), dismissing the complaint and all cross claims for failure to state a cause of action.
Applicable Statutory, Regulatory and Contractual Provisions
A review of the relevant statutes and regulations reveal a multitude of governmental agencies involved in the well-being of children attending day-care facilities. The licensing and registration of child day-care facilities within New York State is governed by Social Services Law § 390, which requires the Department of Social Services to license or register and inspect all such facilities, including a “family day care home,” the type of program operated by defendant Theroulde (see Social Services Law § 390 [1] [e]). The version of Social Services Law § 390 in effect at the time of the injury to Briana in February 2000 provided, however, “[notwithstanding any other provision of law, this section shall not apply to child day care centers in the city of New York” (Social Services Law § 390 [13]).[4] This reflected the prior practice of designating DOH as the agency responsible for registering all child day-care providers within the city. Therefore, during all relevant periods, DOH was the city agency responsible for registering child care providers, including defendant Theroulde.
Social Services Law § 390 (1) defines various categories of “child day care” facilities, including a “child day care center,” a “group family day care home” and a “family day care home,” based upon the number and ages of the children each provider is authorized to care for. A “family day care home,” the type of facility operated by defendant Theroulde, provides care in a family home for three to six children, is required to register with the New York State Department of Social Services and to operate in compliance with the Department’s regulations in 18 NYCRR part 417 (“Family Day Care Homes”) (see Social Services Law § 390 [1] [e]; [2] [b]; 18 NYCRR former 417.1 [a], *928 [g]).[5] As has been noted above, within the City of New York, DOH is the agency under contract with the State, specifically with NYSOCFS, to administer the registration requirements for family day-care homes, including reviewing all applications for the registration and the renewal of the registration for such facilities and recommending to NYSOCFS whether an application should be approved or denied (see Appell aff in opp, exhibit 3, contract, “Rules and Responsibilities” at 2).
The certificate of registration issued to a family day-care provider, like defendant Theroulde, is analogous to a license, as it signifies the provider’s compliance with certain requirements set forth in the regulations. In order to obtain an initial registration certificate for a family day-care home, a provider must submit an application substantiating compliance with the detailed regulatory requirements set forth in 18 NYCRR former 417.2 (see Shaken aff in support, exhibit J, “Family Day Care Registration Application” submitted by defendant Theroulde to obtain her initial registration certificate in 1997). The operator of a family day-care home must submit an application to renew the registration certificate in compliance with the requirements set forth in 18 NYCRR former 417.3 (see Shakeri aff in support, exhibit J, “Family Day Care Registration Renewal Application” submitted by defendant Theroulde in October 1998).
The “Family Day Care Agreement” section of the application signed by defendant Theroulde on October 19, 1998 for the renewal of the registration of her family day-care home contained the following statement:
“I, Patricia Theroulde, am 18 years of age or older and acknowledge that I have received, read and understand the New York State Department of Social Services regulations (18 NYCRR Part 417) for the operation of a family day care home. I agree that my home is in compliance and I will continue to operate my family day care home in compliance with these regulations.
“I understand and agree that I will not abuse or maltreat any child in my care and further, will not tolerate or condone an act of abuse or maltreatment by anyone in the family day care home.
“I understand and agree that I must report to the *929 State Central Register any suspected incidence of child abuse or maltreatment concerning a child in my care.” (Shakeri aff in support, exhibit J.)
When she signed the application, defendant Theroulde was aware of the incident of child maltreatment which occurred on September 29, 1998, as well as another prior incident of maltreatment in 1997, and, thus, misrepresented that she was in compliance with the applicable regulations, including 18 NYCRR former 417.6 (“Child Abuse”), in effect at that time, which provided as follows:
“(a) Any abuse or maltreatment of a child, either as an incident of discipline or otherwise, is prohibited. An abused child or maltreated child means a child defined as an abused or maltreated child pursuant to section 412 of the Social Services Law.
“(b) Any child day care provider operating a family day care home must prohibit the abuse or maltreatment of children while the children are in their care and must not tolerate or in any manner condone an act of abuse or maltreatment by an employee, volunteer, individual residing in the home or any other person under the provider’s control.
“(c) In accordance with the provisions of sections 413 and 415 of the Social Services Law, family day care providers must report any suspected incidents of child abuse or maltreatment concerning a child receiving day care to the State Central Register of Child Abuse or Maltreatment or cause such a report to be made when such providers have reasonable cause to suspect that [a] child coming before them in their capacity as family day care providers is an abused or maltreated child. Such report must be followed by a written report within 48 hours, in the form and manner prescribed by the department, to the child protective service of the social services district in the county in which the child resides.”
Andrea Batts, the Director of Family Day Care Registration at DOH, signed defendant Theroulde’s initial registration certificate and her renewal registration certificate. In response to a deposition question by plaintiffs’ counsel as to whether DOH does “anything other than the application and what’s required in the application” when determining whether to approve the renewal of a family day-care home registration certificate, Ms. Batts responded “no” (Shakeri aff in support, exhibit H, Andrea *930 Batts dep at 57-58). Incredibly, DOH apparently made no attempt to investigate defendant Theroulde’s day-care facility prior to renewing the registration, despite the fact that it had recently received a memorandum from ACS concluding that the September 29, 1998 incident was an “indicated” instance of “lack of supervision” of a child entrusted to defendant Theroulde, in violation of the applicable regulations in 18 NYCRR former 417.6 and the relevant provisions in the contract between DOH and NYSOCFS.
Significantly, after the plaintiff child was seriously injured, when ACS investigated defendant Theroulde’s maltreatment of Briana, ACS concluded that DOH should not have renewed the registration of defendant Theroulde’s day-care facility in February 1999, given that two prior “indicated” incidents of child abuse and maltreatment had been reported against her in 1997 and 1998 (Appell aff in opp, exhibit 6). It is undisputed that DOH had received written notice from ACS of the September 1998 incident of child maltreatment by defendant Theroulde prior to renewing her registration as a family day-care provider.
The City argues that it is not liable because it simply is not obligated to investigate on a renewal of a family day-care registration; that it lacks the power to terminate a child care provider’s registration for abuse or maltreatment; and, on a renewal, it merely ensures that the proper forms are submitted. However, the contract between the City (DOH) and the State (NYSOCFS), governing the registration of family day-care programs within the city disputes this. Such contract contains a section entitled, “Rules and Responsibilities,” which requires, among other things, the investigation of complaints against day-care providers “that if true would indicate lack of compliance with statutory or regulatory requirements” (contract, “Rules and Responsibilities” at 4). This section of the contract further provides that DOH must investigate complaints that “children may be in imminent danger” by making “an unannounced site inspection ... no later than the next day of program operation” (id.). In addition to the investigation and inspection of the day-care facility which is the subject of the complaint, DOH is required to follow all violations until they are corrected. If the violations are not corrected, DOH must refer the matter to the State “for enforcement action as required by statute and regulations” (id.).
The contract also requires DOH:
“To take appropriate action to preserve the well- *931 being of children in care when instances of imminent danger are identified and to serve, upon direction of the Office [NYSOCFS], a notice of suspension to providers when imminent danger to day care children is identified.
“To maintain inspection reports whether or not violations were found and documentation of compliance or corrective actions on each inspected provider and records on the status and resolution of complaints on providers in provider files. Such reports, documents and records shall be provided to the Office upon request” (contract, “Rules and Responsibilities” at 6).
Thus, the contract makes clear that, on matters in which “children may be in imminent danger,” DOH had an affirmative duty to investigate, inspect, to follow, and refer matters to the State for enforcement action, if not corrected, and to take other appropriate action to preserve the well-being of children (contract, “Rules and Responsibilities’’ at 4, 6).
It is undisputed in the record on this motion that, after receiving the January 26, 1999 memorandum from ACS documenting a recent substantiated incident of the maltreatment of a child entrusted to the care of defendant Theroulde, DOH took no action and did not exercise its responsibility to immediately investigate the incident, including making an unannounced inspection of defendant Theroulde’s family day-care home. Further, DOH did not make any efforts to protect the children entrusted to defendant Theroulde’s care by ensuring that the violations documented by the ACS memorandum were corrected or, if necessary, by taking appropriate action such as recommending that the State suspend the registration of defendant Theroulde’s facility, as required by the contract. Instead, the record indicates that DOH merely routinely renewed the registration certificate for defendant Theroulde’s family daycare home, despite a written report of the maltreatment of a child she was responsible for.
Amendment of City’s Answer to Assert Immunity Pursuant to Social Services Law § 419
The City seeks to amend its answer to assert the defense of qualified immunity pursuant to Social Services Law § 419, which provides:
“Any person, official, or institution participating in good faith in the providing of a service pursuant to *932 section four hundred twenty-four of this title, the making of a report, the taking of photographs, the removal or keeping of a child pursuant to this title, or the disclosure of child protective services information in compliance with sections twenty, four hundred twenty-two and four hundred twenty-two-a of this chapter shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any person, official, or institution required to report cases of child abuse or maltreatment or providing a service pursuant to section four hundred twenty-four or the disclosure of child protective services information in compliance with sections twenty, four hundred twenty-two and four hundred twenty-two-a of this chapter shall be presumed, provided such person, official or institution was acting in discharge of their duties within the scope of their employment, and that such liability did not result from the willful misconduct or gross negligence of such person, official or institution.”
Although permission to amend a pleading should ordinarily be freely granted (CPLR 3025 [b]), the movant, in this case the City, “must make some evidentiary showing that the proposed amendment has arguable merit” (Helene-Harrisson Corp. v Moneyline Networks, 6 AD3d 151, 151 [1st Dept 2004]; see also Sabo v Alan B. Brill, P.C., 25 AD3d 420, 421 [1st Dept 2006]). The City’s motion to amend its answer to assert a section 419 qualified immunity defense should be denied as this statute does not apply to the registration of child day-care providers, and, thus, such a defense is palpably without merit under the circumstances at bar (see Estate of Steingart v Hoffman, 33 AD3d 465 [1st Dept 2006]).
Social Services Law § 419 provides qualified immunity only with respect to actions taken pursuant to certain enumerated statutory provisions requiring the reporting of allegations of child abuse and maltreatment to the statewide Central Register of Child Abuse and Maltreatment (the Central Register), the investigation of such complaints by the responsible state and local agencies, and certain prescribed actions required to be taken with respect to the child and the family involved in complaints of abuse and maltreatment (see, e.g. Social Services Law § 20 [5] [investigation of death of children whose care, custody or *933 guardianship has been transferred to an authorized agency, and of reports of deaths made to the Central Register]; §§ 422 [statewide Central Register of Child Abuse and Maltreatment], 422-a [child abuse and neglect investigations; disclosure], 424 [duties of child protective services in response to reports of abuse and maltreatment]).
The City seeks to use section 419 to shield itself from liability for its inaction after receiving a report from ACS of undisputed maltreatment by the defendant child care provider. The Court of Appeals has, however, stated, “There is no indication that section 419 was intended to apply to failures to provide the services required by the Social Services Law” (Mark G. v Sabol, 93 NY2d 710, 722 [1999]). In Sean M. v City of New York (20 AD3d 146, 158 [1st Dept 2005]), the Appellate Division similarly concluded that
“the immunity conferred by section 419 is confined to the making of reports, the removal of a child from the home and the provision of services pursuant to Social Services Law § 424, which section merely describes the ‘[d]uties of the child protective service concerning reports of abuse and maltreatment.’ ”
Accordingly, the Appellate Division held that the claims by plaintiff children that municipal defendants failed to supervise their foster parents, in order to prevent abuse and neglect, are not barred by statutory immunity pursuant to Social Services Law § 419 (Sean M. v City of New York, 20 AD3d at 158).[6] Similarly, in the instant case, plaintiffs’ claims that the City failed to exercise the required standard of care in renewing defendant Theroulde’s day-care registration and in placing her name on a list of registered day-care providers furnished by ACS to Ms. McLean are not subject to the qualified immunity of Social Services Law § 419. Thus, the defendant City is not *934 entitled to amend its answer to assert a qualified immunity defense pursuant to section 419.
The City’s Motion for Summary Judgment or to Dismiss the Complaint
The City asserts that it is not liable, as a matter of law, for Briana’s injury, as its issuance of family day-care provider registrations is ministerial in nature and, thus, not actionable absent a failure to comply with the applicable governing rules or standards. In addition, the City asserts, as a further basis for avoiding liability in this case, that it did not place Briana in the care of defendant Theroulde and, thus, it did not have a “special relationship” with Ms. McLean and Briana. For the reasons discussed below, the City is not entitled to summary judgment on either of these theories.
The following general principles govern motions for summary judgment. Summary judgment is a drastic remedy, which is the procedural equivalent of trial, and should not be granted where there is any doubt as to the existence of triable issues of fact (see S.J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338, 341 [1974]; Sillman v Twentieth Century-Fox Film, Corp., 3 NY2d 395, 404 [1957]; Epstein v Scally, 99 AD2d 713, 714 [1st Dept 1984]). The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (see Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). Further, in order to obtain summary judgment, the movant must “establish his cause of action or defense ‘sufficiently to warrant the court as a matter of law in directing judgment’ in his favor (CPLR 3212, subd [b]), and he must do so by tender of evidentiary proof in admissible form” (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979]; see also Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). The failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers (see Winegrad v New York Univ. Med. Ctr., 64 NY2d at 853; see also Wright v C.H. Martin of White Plains Rd., Inc., 23 AD3d 295 [1st Dept 2005]). Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to “produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim or must demonstrate acceptable excuse for his failure to meet the requirement of tender in admissible form” (Zuckerman v City of New York, 49 NY2d at 562).
*935 In seeking summary judgment, the City emphasizes the distinction between the discretionary and the ministerial acts of government employees. The Court of Appeals explained this distinction in Lauer v City of New York (95 NY2d 95, 99 [2000]):
“A public employee’s discretionary acts — meaning conduct involving the exercise of reasoned judgement — may not result in the municipality’s liability even when the conduct is negligent. By contrast, ministerial acts — meaning conduct requiring adherence to a governing rule, with a compulsory result— may subject the municipal employer to liability for negligence.”
Regardless of whether the determination of the DOH to renew the registration of defendant Theroulde as a family day-care provider is considered to be ministerial or discretionary, there is a triable issue of fact as to the City’s liability precluding dismissal of this case. If the DOH’s conduct in approving the renewal of defendant Theroulde’s registration is considered to be ministerial, DOH clearly disregarded the governing rules in the contract with NYSOCFS, requiring DOH to promptly investigate any complaints against a provider indicating that children were in imminent danger and to ensure that all violations are corrected or referred to NYSOCFS for enforcement proceedings (contract, “Rules and Responsibilities” at 4-6). DOH not only failed to investigate defendant Theroulde’s day-care home after receiving from ACS in January 1999[7] a written report of an “indicated” complaint of lack of supervision of a child entrusted to defendant Theroulde’s care, it also routinely renewed Ms. Theroulde’s registration as a family day-care provider, despite the red flag of a recent substantiated complaint of serious maltreatment of a child.
Courts have held that governmental immunity does not immunize government agencies from claims relating to the failure to properly supervise children they have entrusted to foster care (see Sean M. v City of New York, 20 AD3d at 158-161; Liang v Rosedale Group Home, 19 AD3d 654 [2d Dept 2005]; Merice v County of Westchester, 305 AD2d 383 [2d Dept 2003]; Barnes v County of Nassau, 108 AD2d 50 [2d Dept 1985]; Bartels v County of Westchester, 76 AD2d 517 [2d Dept 1980]). Significantly, in Sean M. v City of New York, the Appellate Division emphasized that it was not necessary to establish a “special relationship” in order to hold the City liable for failing to supervise children *936 entrusted to foster care, “[s]ince there is no question that the City was subject to statutory duties to safeguard plaintiff children while they were entrusted to the care of foster parents” (20 AD3d at 159). The role of DOH in registering family daycare providers, to whom parents entrust their children, is analogous to children entrusted to foster parents by government agencies. Thus, registration by DOH is required in order to protect children enrolled in family day-care facilities, primarily by working parents, and is governed by Social Services Law § 390 (in jurisdictions outside of the city) and, within the city, by the regulatory standards in 18 NYCRR part 417 and in the contract between DOH and NYSOCFS.
Even assuming, for the sake of argument, that plaintiffs are required to demonstrate a “special relationship” with the City in order to maintain this action, they have fulfilled the requisite criteria under the circumstances of this case. A “special relationship,” in order to hold a governmental agency liable for negligence, requires:
“(1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) the party’s justifiable reliance on the municipality’s affirmative undertaking” (Pelaez v Seide, 2 NY3d 186, 202 [2004]; see also Cuffy v City of New York, 69 NY2d 255, 260 [1987]).
The Court of Appeals explained that the purpose of the “special relationship” test was to limit the government’s secondary liability “to prevent the acts of third persons who are the primary wrongdoers” (Pelaez v Seide, 2 NY3d at 205). The Court further stated, “While, on occasion, the government’s failure to act is so severe as to render it liable, no government could possibly exist if [it] was made answerable in damages whenever it could have done better to protect someone from another person’s misconduct” (id. at 205-206).
In Prasad v County of Orange (159 Misc 2d 330 [Sup Ct, Orange County 1993, Miller, J.]), the court held that the defendant County may be held liable for negligently failing to notify parents that a family day-care home which the County had registered and certified to care for their children had been closed for failure to comply with the applicable statutory and regulatory requirements. The court analogized the registration of *937 family day-care providers to cases holding that a government agency could be held liable for negligently supervising children placed in foster care (id. at 333). In addition, the Prasad decision cited Sinkler v County of Monroe (127 AD2d 1006 [4th Dept 1987]) in which the Appellate Division held that a complaint stated a cause of action against the County for negligence in selecting, certifying and supervising a day-care provider who injured a child placed in the day-care home. Similarly, this is a case in which the City can be held liable for egregious errors and omissions, including renewing a family day-care provider’s registration certificate, despite a written report of a recent substantiated incident of maltreatment of children by that provider.
In Prasad, the court emphasized that a “special relationship” existed between the government agency responsible for certifying and registering family day-care providers (in that case the County Department of Social Services), and the “protected class” of children placed in family day-care homes by their parents in reliance upon the registration certificates. The court stated, “In making such certification, the County was obligated to carry out its duties in accordance with the prevailing statutory mandates and the applicable rules and regulations of the Department [of Social Services], all with due regard for the safety of the children the statutes were designed to protect” (Prasad v County of Orange, 159 Misc 2d at 332). The court then concluded that the elements of the “special relationship,” including the “direct contact” element, were satisfied under the facts presented:
“It becomes apparent that when a State imposes specific duties for the care of a protected class, a special relationship is created between the governmental subdivision entrusted with the implementation and enforcement of those duties and the members of the protected class. The fact that the infant plaintiffs in this action were not placed in the day care home by the County does not mandate a different result, inasmuch as plaintiffs were members of the protected class whose reliance on the Department’s certification was reasonably foreseen. The Department certified Sheila Wilson’s home as safe, and Mrs. Prasad testified that she had relied on the certification. Thus the ‘direct contact’ element of the special relationship is satisfied. . . .
“Furthermore, the Department was well aware that *938 the infant plaintiffs were in day care in Sheila Wilson’s home when Sheila Wilson’s certification was ‘closed’. Having made an administrative determination that the day care did not meet statutory criteria, and that the home was no longer in compliance with statutory requirements, the County was under a special duty to the limited class in attendance at the Wilson home to notify them that the home which it previously certified as ‘suitable’ was, in its determination, no longer so.” (Prasad v County of Orange, 159 Misc 2d at 333-334.)
In an appeal of a subsequent order in the Prasad case, the Appellate Division held that the trial court had incorrectly instructed the jury that the County could not be held liable if the claims of negligence involved judgmental or discretionary errors as opposed to ministerial errors (R.B. v County of Orange, 220 AD2d 401, 402 [2d Dept 1995]). The Appellate Division concluded:
“Based on the trial court’s decision that the County, as a matter of law, owed a special duty to plaintiffs, any inquiry into whether the negligent acts alleged by the plaintiffs were discretionary, and thus subject to immunity, or ministerial, therefore subjecting the County to possible liability, became unnecessary. Thus, the plaintiffs should have been permitted to argue that departures, both discretionary and ministerial in nature, resulted in the alleged negligent acts and that the County might be liable for such acts” (id.).
In addition, cases have held that incidents of child abuse and neglect have justified the revocation of registration certificates and licenses to operate family day-care facilities (see, e.g. Matter of Sindone-Thompson v New York State Off. of Children & Family Servs. Bur. of Early Childhood Servs., 296 AD2d 776 [3d Dept 2002] [affirming revocation of group family day-care license issued to petitioner who left a child alone in a car in frigid weather]; Matter of Bullock v State of N.Y. Dept. of Social Servs., 248 AD2d 380 [2d Dept 1998] [substantial evidence supported determination that day-care teacher was guilty of maltreatment by leaving a child alone in a park]; Matter of Frye v Kaladjian, 209 AD2d 787 [3d Dept 1994] [upholding revocation of group family day-care license, after finding numerous violations, including exceeding the maximum capacity of children permitted under the regulations]).
*939 Contrary to the disingenuous argument by the City that a provider, such as defendant Theroulde, could not have her registration revoked without a prior hearing, cases have upheld the immediate suspension of the registration of a day-care provider based upon violations representing an imminent danger to children (see Matter of Rembert v Perales, 187 AD2d 784, 787 [3d Dept 1992] [upholding suspension of registration of day-care provider where violations, including exceeding the maximum number of children permitted by regulation, “posed an imminent danger to the safety of the children entrusted to her care”]). Indeed, as pointed out above, the contract between DOH and the State authorizes DOH to recommend that a family day-care provider’s registration be suspended “when imminent danger to day care children is identified” (contract, “Rules and Responsibilities” at 6).
Accordingly, a government agency can be held liable for negligent acts and omissions involving a protected class of individuals, in this case children in registered family day-care facilities, regardless of whether the alleged acts or omissions are ministerial or discretionary in character, as there is a special duty owed to such children. In the instant case, there was a special relationship between the DOH (the city agency responsible for registering family day-care providers), the ACS (the city agency responsible for both investigating complaints of child abuse and maltreatment and for furnishing lists of registered day-care providers to parents), and the “protected class” of children, including Briana, whose working parents rely on the registration requirements to locate safe day-care providers.
Ms. McLean, a single working mother, fastidiously performed the due diligence to find a safe day-care provider to care for her six-week-old daughter while she worked full time as a receptionist (McLean dep at 10-11, 28-29). She started the process before Briana was even born, when she was pregnant, so that she could continue to work to support her family (McLean dep at 44-45). Ms. McLean testified that she called the ACD to obtain a list of registered day-care providers and was assured by an ACS employee that the providers on the list she would be furnished, which included defendant Theroulde, did not have, any complaints against them (McLean dep at 45-48).
Indeed, the detailed requirements for registered family daycare providers in Social Services Law § 390, the regulations in 18 NYCRR part 417 and the contract between DOH and the *940 State would be rendered meaningless if providers, like defendant Theroulde, with recent written reports substantiating the maltreatment of children entrusted to their care, can routinely obtain and renew registration certificates. Working parents, like Ms. McLean, rely upon the lists of registered day-care providers furnished by government agencies, such as ACS, as a primary means to locate safe facilities for their children while they are at work. Accordingly, the ability of working parents to obtain safe licensed day-care facilities would be severely curtailed, and the lists of registered providers they receive from ACS are rendered meaningless, if the City abdicates any of its responsibilities to investigate, suspend and exclude providers who have maltreated children entrusted to their care. Thus, there is a triable issue of fact as to whether DOH negligently abdicated its responsibility to immediately investigate defendant Theroulde, after receiving the ACS January 1999 written report substantiating a recent incident of the maltreatment of a child entrusted to her care. Further, there is a triable issue of fact as to whether the City was negligent by failing to either recommend the suspension of defendant Theroulde’s registration or to deny a renewal of her registration as a family day-care provider, and, if so, whether this negligence was a substantial factor in causing Briana’s injuries.
Lastly, plaintiffs’ supplemental submissions indicate that defendant Theroulde may have participated in the New York State Department of Health Child and Adult Care Food Program, a state and federal program providing reimbursement for certain foods purchased for the children in the day-care program (plaintiffs’ supplemental reply brief 11 7, exhibit 15). There is, thus, a further triable issue of fact as to whether defendant Theroulde was a provider of “subsidized child care,” governed by the provisions of section 21-120.1 of the Administrative Code of the City of New York and, if so, whether the City complied with the applicable regulations. These regulatory provisions require more frequent inspections of subsidized day-care providers than are required to obtain and renew a family day-care registration certificate (see Administrative Code of City of NY § 21-120.1 [b] [4] [homes where subsidized day care is provided must be inspected no less than five times per year]).
For the reasons discussed above, plaintiffs have stated claims against the defendant City for negligence by failing to enforce the applicable statutory, regulatory and contractual provisions requiring prompt inspection of family day-care facilities which *941 are the subject of reports indicating an imminent danger to children, and prohibiting such day-care facilities from engaging in the abuse or maltreatment of the children entrusted to their care. This is a particularly egregious case as it is undisputed that, even after DOH received a written report from ACS that defendant Theroulde had, in fact, maltreated a child entrusted to her care, DOH inexplicably did nothing. Indeed, despite the written report of the maltreatment of a child entrusted to the care of defendant Theroulde, DOH routinely renewed the registration of defendant Theroulde’s day-care facility with the knowledge that it would be held out to working parents, like Ms. McLean, as a safe place for their children. Plaintiffs have raised triable issues of fact as to whether the City is liable for negligence by abdicating any of its responsibilities to protect working parents and their children. Specifically, there are triable issues of fact as to whether the City fulfilled its obligations to enforce the statutory, regulatory and contractual requirements mandating the prompt investigation of reports of child maltreatment and requiring the suspension, revocation, or the nonrenewal of the registration of day-care providers, like defendant Theroulde, who have abused or maltreated children entrusted to their care. Therefore, the City’s summary judgment motion is denied.
Accordingly, it is ordered that the City’s motion to amend its answer, and to dismiss the complaint, or for summary judgment, is denied.

. The earlier incident of maltreatment of a child under the care of defendant Theroulde, which apparently occurred in 1997, is noted in the ACS report of its investigation of the incident involving Briana, which is the subject of this action.

. Courts have held that “shaken baby syndrome,” “resulting from an infant being held around the chest and shaken back and forth, and causing, [among other things], subdural collections of blood in the cranial cavity, retinal hemorrhages and fractured ribs” (Matter of Antoine J., 185 AD2d 925, 926 [2d *926 Dept 1992]), constitutes a basis for a finding of child abuse or maltreatment (see Matter of Infinite G.,11 AD3d 688 [2d Dept 2004]; Matter of Westchester County Dept. of Social Servs. v Felicia R., 215 AD2d 671 [2d Dept 1995], Iv denied 86 NY2d 708 [1995]; Matter of Antoine J., supra). The report of the incident involving Briana by ACS found that “Briana . . . sustained acute and chronic subdural hem[a]toma, which indicates Shaken Baby Syndrome” (Appell aff in opp, exhibit 6).

. In an interim order dated January 17, 2006, this court directed the parties to submit supplemental memoranda of law addressing certain specific issues, and providing copies of the applicable state or city statutes and regulations. This court has reviewed and considered the parties’ supplemental submissions, pursuant to the interim order.

. In 2003, Social Services Law § 390 (13) was amended to provide, as follows: “Notwithstanding any other provision of law, this section, except for paragraph (a-1) of subdivision two-a of this section, shall not apply to child day care centers in the city of New York” (L 2003, ch 160, § 5, eff June 30, 2003). This amendment became effective after the incident at issue in this action.

. Unless otherwise indicated, the regulatory provisions referred to herein were those in effect at the time of the incident at issue, and have since been renumbered or amended.

. The Appellate Division further stated, “To the extent that Ross v City of New York (302 AD2d 232 [2003]) may be read to the contrary, we overrule it” (Sean M. v City of New York, 20 AD3d at 160). In Ross, the Appellate Division held that a municipality is entitled to statutory immunity pursuant to Social Services Law § 419 from claims involving the removal or keeping of a child pursuant to title 6 of the Social Services Law, absent a finding of “willful misconduct or gross negligence” (Ross v City of New York, 302 AD2d at 232, citing Lara v City of New York, 187 Misc 2d 882 [Sup Ct, NY County 2001] [holding that City is immunized by Social Services Law § 419 from liability for negligence in the administration of foster care, resulting in the abuse of the infant plaintiff; the private agency to which the City referred the child for placement in foster care could, however, be liable for conduct evincing gross negligence or lack of good faith]).

. See Appell aff in opp, exhibit 6.